THE STATE OF TEXAS ET AL V. ALBERTO BALLI ET AL.

No. 8187. Decided December 20, 1944.
Rehearing overruled November 7, 1945.
(190 S. W., 2d Series, 71.)

196

198

Chief Justice Alexander, Justice Sharp and Justice Simpson, each filed a dissenting opinion.

*Gerald C. Mann,* former Attorney General, now of Dallas, *Peter Maniscola,* former Assistant Attorney General, now of Houston, *Robert E. Kepke,* former Assistant Attorney General, now of Tulsa, *Okla., Grovers Sellers,* Attorney General, *Fagan*

*Dickson* and *George W. Barcus*, Assistants Attorney General, all of Austin, for the State of Texas; *Potter & Bezoni* and *Clower & Wilson*, all of Tyler, for Hughes et al; *W. C. Franklin*, of Tulsa, Okla., and *Sydney Smith, of El Paso*, for Crandall, all petitioners.

The Court of Civil Appeals erred in holding that the Texas Constitution did not require a survey to be made or field notes to be filed by January 1, 1880, and that respondents' claim are not forever barred by their admitted failure to file such field notes. New York & Texas Land Co. v. Thomson, 83 Texas 169, 17 S. W. 920; Clark v. Hills, 67 Texas 141; Campbell v. Gibbs, 161 S. W. 430.

The Court of Civil Appeals erred in holding that by the Act of the Texas Legislature in 1852, it did not refuse to relinquish title to Padre Island. Empire Gas & Fuel Co. 121 Texas 138, 47 S. W. (2d 265.

The Court of Civil Appeals erred in holding that the proceedings in 1827-1829, relied upon by respondents, vested title in the Ballis, or gave them the right to secure title, of the character protected by the Treaty of Guadalupe Hidalgo and the decisions of Texas. Edwards v. Davis, 3 Texas 321; Wood v. Welder, 42 Texas 408; Smith v. Power, 23 Texas 29.

It was error for the Court of Civil Appeals to hold that under their grant the respondents were entitled to the entire island, and not be confined to eleven and one-half leagues. Sullivan v. Texas, 207 U. S. 416; State v. Indio Cattle Co., 154 S. W. (2d) 308.

The Court of Civil Appeals erred in holding that the line of mean high tide and not the highest winter tide marked the boundaries of the Mexican civil law grants on the seashore, and that the line made by the surveyor and described in the judgment was a survey of the high winter tide line. Galveston City Surf Bathing Co., v. Heidenheimer, 63 Texas 559; Curry v. Port Lavaca Channel and Dock Co., 25 S. W. (2d) 987; Rosborough v. Picton, 34 S. W. 791, 43 S. W. 1033.

*Davenport & Ransome, Harbert Davenport, Seabury, Taylor & Wagner, F. W. Seaberry* and *J. T. Canales*, all of Brownsville, *Kleberg & Eckhart, B. D. Tarlton* and *Howell Ward*, all of Corpus Christi, *Lawler, Wood & Childress*, of Houston, *J. W. Timmins, of Dallas*, and *Paul A. McDermott*, of Fort Worth, for respondents.

The grant of Padre Island to the Ballis was made by specific authority of the State of Tamaupilas Statute, and prior approval of Supreme Government was not required, and if such approval were necessary it could be presumed. Chambers v. Fisk, 22 Texas 504, 527; State v. Palacios, 150 S. W. 229; Cavazos v. Trevino, 35 Texas 133.

The grant was for the whole island and payment was for the pasture land contained therein and what waste land existed was included in the grant. Lodges' Lessee v. Lee, 6 Cranch 237; Corrigan v. State, 94 S. W. 95-98; State v. Gallardo, 106 Texas 274, 85 S. W. 288.

Under the rules of law as to alluvion and accretion in effect in Tamaulipas at the time of the grant, which did not different from those now in effect, the boundaries of Padre Island were correctly established by the judgment from the field notes of the Boyles survey. Lorino v. Crawford Packing Co., 169 S. W. (2d) 235; De Merit v. Robison, 102 Texas 358, 116 S. W. 796; State v. Grubstake Investment Assn., 117 Texas 53, 297 S. W. 202; Dincans v. Keeran, 192 S. W. 603.

MR. JUDGE SLATTON, of the Commission of Appeals. delivered the opinion for the Court.

This is a suit for the title and possession of Padre Island instituted by the State in the district court of Nueces County. Padre Island is situated within the present counties of Nueces, Kleberg, Kennedy, Willacy and Cameron, and is about 110 miles in length. The island is bounded by the Gulf of Mexico on the east, Laguna Madre on the west, Corpus Christi Pass on the north, and the Brazos Santiago Pass on the south. The island is described in the State's third amended original petition, on which the case was tried, as containing 135,213 acres of land. The adverse claimants to the State base their claim through mesne conveyance from the Padre Nicolas Balli. The Balli claim grows out of the proceedings with the State of Tamaulipas had in the years 1827-1829, inclusive. In clause 16 of a revoked will of the Padre Nicolas Balli (Spanish wills of 1811 were archieved in the office of the notary public before whom acknowledged and became public records even though they might never take effect as wills) extant in the Matamoros achives and dated November 4, 1811, it is recited:

"I claim as my property the grazing pasture of the Island, while I am not in possession, this is due to the unsettled times, but in fact I had it surveyed and adjudicated and I maintain in there 1000 head of cattle. I command my heirs that as soon as the times quiet down they shall endeavor to perfect it until the

testimonio of the ownership (or title) is obtained. I so state that it may be noted."

The effective date of Mexican independence was September 27, 1821. The former Spanish colony of Nuevo Santander became the State of Tamaulipas after the organization of the New Mexican government in 1824.

The first general land law of the new State of Tamaulipas, the General Colonization Law of December 15, 1826 (Sayles' Early Laws, Article 89) provided, with regard to applications for lands denounced under the former government for which the titles were incomplete, as follows:

"Sec. 26. Designators of land, which, in time of the ancient government, did not perfect their adjudication shall present themselves to the respective authority to continue its course according to the state thereof, affecting the same within the term of forty days from the date of the publication of this law; and on the contrary, said lands shall be considered open to designation as vacant."

On December 11, 1827, the Padre Nicolas Balli, acting through Diego de Leon, his attorney in fact, presented to Lucas Fernandez, governor of Tamaulipas, his petition for a completed testimonio of the earlier Spanish proceedings, or, in its absence, for a new title from the State of Tamaulipas. The land described in the petition is as follows:

"For the land of the Island of Santiago that terminates at the Corpus Christi Bar and consists of 19 1/2 sitios." (or square leagues.)

We quote briefly from the expediente which was archieved in Matamoros and was offered in evidence by the adverse claimants to the State:

"State of Tamaulipas

"2nd Judge of Matamoros                                    Year of 1928.

"*Expediente* of inspection and demarcation of the land of the Island of the Brazo de Santiago, situated in this jurisdiction, Denounced by the Governor of this state to the Citizen Bachelor Nicholas Balli, as ancient possessor of this land; and to his Nephew Juan Balli."

DENUNCIO

The proceedings, as archived, begin with a petition to Lucas Fernandez, Governor of Tamaulipas, of date December 11, 1827, by Diego de Leon, as attorney in fact for the Padre Nicolas Balli. Its pertinent portions read:

"That having appeared before the Court of Reynosa as Attorney-in-fact for my Grantor to solicit a new copy of the judicial acts and proceedings (testimonio) because the one that I presented your Excellency appeared to be incomplete, the original not having been found in that Archive, and inferring from that, that the same may have been misplaced in the years gone by, or that the commissioner should have forwarded said instructive dispatch (expediente) to the Seat of Government about the year 1800 when the Count of Sierra Gorda was Governor, it is my desire to again appeal to your Excellency in the name of my principal, requesting that in the event that the instructive dispatch (expediente) be found in the Archives of the Government, which is now in your charge, your Excellency will order the proper person to extend to me an official copy thereof in order to perfect the application for a grant of the land in the Island of Santiago, which my principal as first (antiguo) settler has heretofore presented; and in the event that said instructive dispatch is not found, your Excellency may accept this as a new application for the land of the Island of Santiago that terminates at the Corpus Christi Bar and consists of Nineteen and half (19 1/2) sitos in favor of my Principal and of his nephew Don Juan Jose Balli, who are ready and willing to satisfy and pay the costs and charges for said land, because it is convenient and advantageous for them for the raising and increase of the cattle that they possess, and thus to prevent that said property should be incorported by others to their prejudice. I doubt not but that your Excellency taking into consideration the foregoing, the injuries and damages caused by the Carancahuases Indians, that the lands are sandy, that they have no adjoining owners, will agree to grant them the possession that they request, issuing the proper order of the Court of Justice at Matamoros so that the necessary legal proceedings be taken until they be placed in peaceful possession of said Land. All with the approval of the Counsel of the State and the audiencia of the Fiscal as provided by the Colonization Law."

## GOVERNOR'S ADJUDICATION

The governor's action on this de Leon petition is embodied in his decree of January 2, 1828, and was:

"Not having found in the Archives of this Government the original proceedings, nor the instructive dispatch that the above party mentions and taking into consideration the rights of the parties he represents, I have determined that the Alcalde of the Village (Villa) of Matamoros, after summoning the surveyor named by the Government, the Citizen Domingo de la Fuente, shall proceed to the visual inspection and survey of the lands

of the Island of Santiago and all the other legal steps that the law provides, remitting all such proceedings to this Government so that in the event that there is no opposition by right of obsion, or possession there shall be extended to the party the corresponding title of adjudication and property."

### JUDICIAL DECREE DIRECTING SURVEY

Pursuant to the governor's order, the second judge, or alcade, of Matamoros, decreed on February 8, 1928:

" * * * Let there be a survey and demarcation of the land of the Island of Brazo de Santiago, situated in this jurisdiction denounced and adjudicated by said government to the citizens of this vicinity, Bachelor Nicolas Balli, as ancient settler of said land, and to his newphew Juan Balli; all proceedings to be had in conformity with the Supreme decree aforesaid, and the Colonization Law of this State. * * *"

### JUDICIAL REPORT OF VISUAL INSPECTION

Visual inspection of the lands denounced is certified by the judge as having been conducted by him on the 14th, 15th, 16th, 18th, and 19th, and concluded on February 20, 1828.

"On February 14, 1828, the certificate is that he proceeded with his assisting witnesses, etc. from San Martin 'to the Island of Brazo de Santiago to carry out the visual inspection * * * and crossed to the other side of said Brazo'; and on the same day began the visual inspection 'on the other margin of the Brazo de Santiago, the beginning point of the boundaries of the lands denounced by the * * * Citizens Bachelor Nicolas Balli and Juan Balli' and continued the inspection that day from South to North to a place called El Jardin, 'Finding nothing in the whole distance travelled except sand dunes, some salty bays, very little and very poor pasture land."

"On the 15th he certifies that the visual inspection following the same course, continued to the rancho of Santa Cruz de Buena Vista, in which distance 'Nothing was found but sand dunes and salty bays with very little pasture grass (with the exception of an opening situated at or near the entrance to said rancho which contains a certain amount of grass) a large amount of cattle and horses belonging to the interested parties'.

"On the 16th the inspection was continued from Santa Cruz de Buena Vista to 'The Place known as Los Sauces de San Jose, in which distance no other thing was found but many sand dunes, containing a reasonable amount of pasture grass, some salty

bays, one fresh water lake, and some stock belonging to the interested parties'.

"The 17th was a holiday, but on the 18th the inspection continued from Sauces de San Jose to 'The place of San Vicente' nothing being found but "Many sand dunes with much pasture grass, some salty bays, and one fresh water lake'.

"On the 19th the inspection was from San Vicente to Carnestolendas in which distance was found 'Many sand dunes completely covered with pasture grass, some salty bays, lying from East to West, and some horse stock belonging to the interested parties'.

"On the 20th the inspection was continued from Carnestolendas to the Brazo de Corpus Christi, 'Where the above mentioned lands terminate', there being found in that distance 'some wild horse stock belonging to the interested parties, also lands with many high sand dunes, some sand hills covered with grass and large thick trees that are known as Palo de Muelas; a great number of willows, oleanders, short oaks, plenty of herbs known as anise, many fresh water lakes, or pools, covered with reeds, which are known to be permanent'. On the same day there was inspected an opening angle (ricon) on said Brazo, where were found 'good Pasture lands, some sand dunes, some high sandy places covered with many willow trees on its side, and low places.

"On the same day, (February 20, 1828) the Judge certified that 'having concluded the visual inspection of the Lands and Island called Brazo de Santiago * * * the visual inspectors and the other members of the committee were examined closely' and from the inspection and examination of the witnesses the Judge concluded that taking into consideration

"(a)  'The lay of the land from its center lines and * * * the terrain which is uneven and broken by reason of several deep gullies caused by drainage in time of floods, for some of these lands are overflowed when the sea is at high tide.

"(b)  'That said pasture lands were inhabited for a short period by the savage tribe of Indians known as Tarancahuaces (though at present they are peaceful).

"(c)  'Being without a permanent source of water supply, except during the rainy season, when the various lakes and reservoirs therein situated are filled.

"(d)  'There is no other entrance than the one mentioned, that is the aforesaid Brazo de Santiago.'

concluded: 'That said lands are solely useful for horse stock and cattle.' "

## JUDICIAL REPORT OF SURVEY

"The official survey is certified by the Judge as having been begun at one P. M. on February 20 'at the place of Corpus Christi', and as having been concluded 'At the aforesaid place of Brazo de Santiago', February 29, 1828. It consisted, basically in running a line generally from North to South, along the Gulf shore of the Island, with right angle traverses across the Island to 'the borders of the Laguna Madre' at intervals, usually of 10,000 varas. The line along the shore was run on February 20th and 21st, from the place called Corpus Christi to that called Carnestolendas; both named in the report of inspection; and later on the 21st, from Carnestolendas to Los Laurelitos, thence, on the 22nd, to San Juan de las Crucitas, and thence, on the same day, and after running a transverse 'to the margin of the laguna', it was continued to the place of 'The Buried Stone of Palmerito' to the 'Pass of San Augustin' which was land-marked as 'The half way, or middle, of the land'.

"The 24th being a holiday, the survey was resumed on the 25th, and continued after running a traverse, from the San Augustin landmark to Los Sauces de San Jose. On the 26th it was again continued, (with another transverse) to a place called Devisadero; from thence on the 27th, after another transverse, to the Rancho de Buena Vista, identified in the report of inspection. On the 28th it was run from Buena Vista to a place called Boquilla de Loma Alta; the point of departure for another transverse; and on the 29th it was continued, with a final transverse, 'until we arrived at the Brazo de Santiago where this survey terminated.' "

## SURVEYOR'S OFFICIAL REPORT AND FIELD NOTES

At Matamoros on March 5, 1828, the judge officially certi fied that:

"The Citizen Domingo de la Fuente, the Official Surveyor appointed by the Governor of the State, as well as by the persons that denounced said Island, being well known to me and being personally present, delivered to me his analytic report (Plan Demonstrativo) consisting of six pages, including the corresponding map, and one blank page, and the calculation of what said land consists of, as better shown in the beginning and in the ending of said analysis, which consists of Eleven Leagues (sitios) for large stock and six caballerias of land of which said whole pasture consists, which plan I order to be attached to the

Instructive Dispatch (expediente) on this matter in order to be remitted to His Excellency, the Governor of this State, that in view of which His Excellency may order whatever may be of his superior pleasure by reason of the fact that his Decree of January 2nd of the current year has been, in all things, complied with as far as possible.

"The Plan Demónstrative was captioned by the official surveyor:

" 'Demonstrative Plan of the Island of Santiago, denounced uniformly by the ecclesiastic Citizen Nicolas Balli, and his nephew, Juan Jose Balli, resident citizens of the Village of Matamoros to whom said Island belongs, which lies between the sea and the Laguna Madre. Its length from south to north consists of thirty nine leagues and eighty five cordeladas. Its width from East to West at its widest portion is fifty nine cordeladas diminishing toward each end in unequal proportion until it ends in an angle, following the bends and curvatures formed by the shores of the sea and the Laguna which causes the uneven width of land. This Island contains eleven sitios for large stock and six caballerias.'

"De la Fuente's field notes of the survey, conforming generally to the Judicial Report (with unimportant discrepancies) were included with his Plan Demonstrativo and map."

### ACTION OF COUNCIL

"On May 6, 1828, at the instance of the Fiscal or Attorney General, the Governor ordered the Alcalde of Matamoros to remit to him the entire file of proceedings, which seemingly had not been done. On June 7, 1828, the expediente as thus completed, was considered by the Consejo, or Council of Government, which reported:

"The lands of the Island of Brazo de Santiago which the Citizen Bachelor Nicolas Balli denounced as ancient possessor and which the Government has adjudicated to him and his brother (should be nephew) Juan Balli, have been surveyed by an expert as shown by the analytic report which shows that the survey is legally correct, but it appears that the aforesaid lands have not been appraised as they should, nor has the visual inspection been carried out according to law because there has been omitted the important step of determining whether the lands contain running or standing waters so that in the whole Instructive Dispatch there is nothing to indicate the highest possible valuation that said lands can have by reason of the advantages that they contain springs, fresh water lakes or pools of fresh

water and salty (or brackish water; such failure is of considerable importance to the interests of the State, which will act detrimentally to its future; in view of this omission the Council is of the opinion that without this important fact this matter cannot be considered as concluded, and it is advisable to keep it as pending matter until everything has been done according to law; so that after hearing the opinion of the Fiscal (Attorney General) the corresponding title may be issued on the property in favor of the interested parties, who for a very small sum of money, with respect to the size of the land and of its superior quality, they will acquire a sure (secure) valuable property, sure (secure) because it is isolated, and valuable because it is abundant in natural resources that constituted it very rich. This is the opinion of the Council but notwithstanding what has been set forth, it will abide the decision of the Government.' "

### CORRECTED REPORT OF INSPECTORS

"In order to comply with the requirements of the Council the Matamoros Judge on July 21, 1828, summoned the official inspectors, who had acted with him in the visual Inspection and survey; these reported under oath, that

" '* * * They say, affirm and prove generally by all the old settlers as well as by those that are able to know and also by new people who live at this time and who have traveled continuously and repeatedly over the Island of Corpus, above referred to, that the greater part of the land is sandy; that it does not contain pools or ponds of rain (fresh) water sufficient to last more than six months, no matter how abundant the rains may be, and not more than three months in time of drought; the case being that there are only two reservoirs (recojerderos) for water than can last six months in times of abundant rainfall as above stated; and the others for shorter periods, ranging from three to one month, of this last class there are fifteen, very small, in all the island. That there has never been any running water and much less permanent springs of water; that constantly, and regularly, livestock, as well as the inhabitants who care for them, get fresh water from holes or wells, and even this cannot be done in all parts of the island, except at certain well marked places. That besides what has been said, the fresh water in the holes that are made, or the wells that have been dug, as above mentioned, naturally and after short duration turns brackish; and when, by accident, permanent water, good to drink, is found, then the sea has a high tide and causes the lakes which are surrounded by, and form in the interior of, said Island, to overflow (the low lands in the Island being the place where the fresh water is found) thus causing the wells to be filled with

brackish water, and necessitating that other wells and holes be dug for the use of the people, as well as for the livestock that . grazes there.' "

### FURTHER ACTION OF COUNCIL

"The expediente, with the inclusion of this new report, was again remitted to the Governor, who again referred it to the Council, which reported to him on August 8, 1828:

" '* * * The Counsel (Consejo) is not satisfied with what has been done in this Instructive Dispatch (Expediente) in the discharge of what was required by its opinion of the seventh of last July, and of Your Excellency's Decree dated the 12th of the same month, because of the contradiction therein noted; however, it (the counsel) may, if it is agreeable to Your Excellency, permit the remaining requirements of the law to be taken until this matter is concluded, requiring only that these proceedings, be placed of record, and extending to the interested party, if he shall demand it, a corresponding copy of this testimonio or legal proceedings. * * *' "

"The expediente with this last action of the Council, was therefore referred by the Governor to the Fiscal, or Attorney General, who on August 11, 1828, reported:

### OPINION OF FISCAL

" 'There are defects noted in the Instructive Dispatch that are necessary to be corrected, to-wit:—The adjoining owners should be cited to a proper visual inspection and survey of the lands; and if there are none, then that fact must be stated by the judge. For the appraisement of the waters, it was necessary for the Government to name one expert, and that the interested parties should name another. The Council is right when it states that there are contradictions in the reports of the ones that made the visual inspection, because the first says that there are lakes that will hold water for a whole year and then in the sub-sequent inspection it is said that they will last not more than six months. It is to be noted also that there is no landmark to mark the starting point of the survey and this is one defect that must be corrected.

" 'Your Excellency may, if it is your pleasure, order that the Instructive Dispatch be returned to the Second Alcade of Matamoros, so that he may make the proper inspection of the land; requiring him to mark the place where there are no fixed boundary lines; to show the place where the survey began; to cite the adjoining owners, and giving them a reasonable time, that Your

Excellency may designate, within which they may state, if they have any claim thereto, and if there are no adjoining owners then for the Judge to say so; that the interested parties may name an expert, so that together with the one named by the Government, they may appraise the waters that the land contains; to state if there are any agricultural lands or they are all good only for pasture; that the ones that made the visual inspection have no interest as this will render them suspicious on account of their aforesaid, contradictions; and this being done, then to return the Instructive Dispatch to the Government for the necessary dispositions. * * *' "

## REPORTS OF APPRAISERS

"On August 18, 1828, the Governor again ordered the expediente returned to Matamoros for compliance with the requirements of the Council and the Fiscal. Appraisers were appointed; Manuel Garza by the Governor, and Antonio Maria Casas by the Ballis; as to whose appointment and qualifications the Judge certified:

" ' * * * I ordered to appear before me the Citizens Manuel de la Garza and Antonio Maria Casas, who being personally present (both known to me), I explained to the first the confidence placed in him by the Government of the State and to the second his appointment by the interested parties to represent their interest in the islet (ensenada) that is situated between the sea, Laguna Madre, Brazo de Corpus and Barra de Santiago, and all being well advised, stated, together, that they accepted and they did accept, the appointment made of themselves; by virtue thereof I, the Judge present, took their oath in due form, in the name of God and making the sign of the Holy Cross under which oath they promised to act faithfully and legally and in conformity the knowledge they already posses and which they may take of that land. * * *'

"And with regard to the inspection by the expert appraisers, the Judge certified:

" 'On the same day and on the same date of the month and year, I, the aforementioned Alcalde, in order that I may execute that has been ordered by the Supreme Government, started the journey to the already mentioned point accompanied by the two experts named and by two assisting witnesses, without summoning (citing) adjoining owners as there were none at any time on that Island, which always had been in the possession of the Citizen Nocolas Balli, and having on the following day arrived at the site (or place) of Barra de Santiago, crossed with my committee to the other side of the Brazo of said Barra, where I

advised the expert appraisers that in conformity the steps taken in the first survey made by the Surveyor Citizen Domingo de la Fuente, they should carefully observe the land that they were going to inspect as well as what appears to be contradictory in the appraisement made by the first expert appraisers, Citizens Yrineo Longoria and Miguel Salinas, whose report the Government of the State distrusted with reference to their valuation for the reasons given in the Opinion of the Council; having been so advised they inspected the Island of Corpus Christi together with me, examining thoroughly its pastures, waters more or less of permanent nature, and all that concerns the benefits or advantages that may be enjoyed on that land by the interested parties, and comparing what had been appraised with what fairly and impartially the second expert appraisers knew themselves. * * *'

"And after incorporating into his decree detailed reports by each of said appraisers, which described the Island in minute detail more especially as to its value, or lack of it, for pasture, and permanence of its fresh water supply; and assessed its value at forty pesos per sitio, the Judge concludes:

" 'Having concluded the present business with reference to the Island of Corpus Christi denounced by the Bachelor Don Nicolas Balli and his nephew, Juan Jose Balli, I, the Judge presiding of the official survey, state that in justice and truth the place where the survey began was opposite the Brazo de Santiago without mentioning any particular landmark for the reason that that tract of land is a banco ensenada, or island situated as already stated, between the Brazo de Santiago Bar, the Corpus Christi Bar, the Laguna Madre and the sea. For that reason, and because said land is entirely surrounded by water, there have never been any adjacent land owners at any time; but it only has been in the possession of its very ancient and first settlers who are those that have been duly cited. * * *' "

### FINAL ADJUDICATION BY GOVERNOR

"On March 12, 1829, the Governor referred the expediente, enlarged by the appraisal and other new proceedings to the Attorney General, who reported on March 17th:

" 'The Judicial proceedings hereinbefore set forth in this instructive dispatch (expediente) with reference to the denouncement of lands made by the Citizens Nicolas and Juan Jose Balli, residents of Matamoros, of the lands situated in that jurisdiction known as the Island of Santiago, having been concluded, it remains now only to deposit the price of eleven (11) sitios and six (6) caballerias which were surveyed, demanding that a re-

ceipt be exhibited for the full amount at the rate of Forty ($40.00) pesos per sitio, as they were appraised; bearing in mind that the money is to be applied to the credit of the State and the City of Matamoros in conformity with what is set forth in the Colonization Law of this State. When this is done your Excellency may cause the Attorney of the Applicants for the land to be cited so that each of his clients may designate the place where he wishes his land to be. In view of their statement it shall be ordered that the land shall be adjudicated to each in equal parts designating which part belongs to one and which part belongs to the other and ordering the Judge who presided at the survey to place them in possession of their respective parts, causing the boundaries to be marked with permanent and noticeable monuments.' "

### TREASURER'S ACKNOWLEDGMENT OF PAYMENT

"The Governor on March 21, 1829, referred the above order to the Treasurer, who, on the same day, acknowledged that:

· " 'On this date there has been paid into the Treasury Four Hundred and Forty six ($446.00) Dollars that belongs to the State in payment of eleven (11) sitos for large cattle (ganado mayor) and six (6) caballerias of land denounced by the Citizens Nicolas and Juan Jose Balli in the jurisdiction of the town of Matamoros, as duly appears in the foregoing instructive dispatch (expediente); consequently your Excellency may resolve what is the proper action to take in this particular.' "

### GOVERNOR'S ADJUDICATION OF TITLE

"And on the same day the Governor decreed:

" 'The price for the sitios and caballerias of land denounced by the Citizens Nicolas and Juan Jose Balli having been duly paid, at the same time the Citizens Attorney for the owners thereof having stated that he is unable to state the amount of land that should be adjudicated to each because they should have to agree as to this among themselves, let this (expediente) instructive dispatch be returned to the Second Alcalde of Matamoros, so that he may put the Citizens Applicants in possession of said lands in conformity with the terms expressed in the opinion of the Fiscal; and for their protection let the interested parties appeal to this Government for the title to the property, which will be judicially certified.' "

### ACT OF JUDICAL POSSESSION

"By the time the growing expediente was again returned to Matamoros, the Padre Nicolas Balli had passed to his reward,

and Macedonio Capistran had succeeded Juan Longoria y Casas as Second Judge. On December 15, 1829, the new judge decreed:

" '* * * That in order to carry out the aforesaid orders of the Supreme Government of the State and of the Fiscal of the Supreme Court of Justice of the same State, let the Citizen Juan Jose Balli be cited to appear for himself and as heir of the deceased Priest Nicolas Balli, likewise all the heirs of the said Padre Balli who are entitled to half of the Island of Corpus to the end that they be given the corresponding possession with the formalities provided by law. * * *'

"And continued, in a later decree on the same day:

" '* * * I command to appear before me and those who are assisting me, the Citizen Juan Jose Balli so that he might be given possession of the part belonging to him in the Island of Corpus; likewise I command the other heirs mentioned in the preceding Act to appear, all being well known to me, and being personally present, I made known to them the purpose for which they were summoned, to which the first above mentioned answered; That being forbidden on account of illness which he has suffered a long time, it was not possible for him personally to take possession of the land, above mentioned, but that he would empower and to this effect he gave a Power-of-Attorney in favor of, his brother-in-law, the Citizen Rafael Solis, to the end that he should take possession, not only of the half of the island that belonged to him, but also and in like manner of the other part to which he, the Citizen Juan Balli, was entitled as Executor. * * *'

"And in certifying to the delivery of Juridical possession, the Judge continued:

" ' Consecutively and in faithful discharge of my obligation I caused myself to be transported to the Brazo de Santiago accompanied by Rafael Solis, the Attorney-in-fact, my assisting witnesses and the instrumental witnesses, to-wit:- the Citizens Juan Cavazos, Louis Cavazos and Anastacio de la Garza; and being on said Brazo, I crossed over to the Island of Corpus, accompanied by the above mentioned parties, and standing on said land I proceeded to place in possession of the eleven (11) sitios for large cattle and six (6) caballerias, of which the Island of Corpus Christi is composed; being comprehended within it, the Island of this name, the place or site known sa "La Boquilla de Loma Alta," the "Rancho of Buena Vista," "El Devisadero," Los Sauces de San Jose," "El Paso de San Augustin," "La Piedra Enterrada del Palmerito" and "San Juan de las Crucitas," "Los Laurelitos," "Carnestolendas" and Brazo de Santiago of which

land the Citizen Rafael Solis took possession in the name of his principal, Juan Jose Balli, of the part that belong to the late, Bachelor Micolas Balli, as better appears from said Power of Attorney which is attached to this instructive dispatch. * * * and I, said Judge, state that I would protect and did protect him in the possession of it, from which he may not be ejected without first being heard, under oath, and legally adjudicated against, and that he will never be required to have a new survey; which possession was taken in the presence of those aforementioned by virtue of which he is and must be considered the true and legitimate owner and lord of the half of said land in conformnity with the application for said land and the adjudication of it made to him by the Governor by virtue of said application and the payment aforesaid; being likewise placed in possession of the part of the land that as Executor of the aforesaid late Padre Balli he should have, so that he, for himself, his heirs and successors as their own, may sell, exchange and convey according to their will. All of which, in order that it may thus legally appear, I entered of record as a judicial act. * * *' "

### JUDICIAL CONCLUSION OF PROCEEDINGS

"And at Matamoros, December 25, 1829, he concluded the proceedings by certifying that:

" ' * * * Having complied with the Supreme decree of His Excellency, the Governor of this State, dated March 21 ultimo, and having placed the Citizen Juan Balli, for himself and for his uncle Don Nicolas Balli, Deceased, in actual and legal possession of the lands in the Island of Corpus Christi; after having exhibited to me the receipt of the Minister of the General Treasurer of this State showing that legal payment had been made by each of them; have ordered, and by these presents do hereby order, that, these proceedings having been concluded and the matter terminated, this instructive dispatch be protocolized in the Archives under my charge, and the interested party, who has taken possession, should apply to this Court for himself and his deceased uncle, Don Nicolas Balli, for the legal certificate referred to in the said Supreme decree, so that with it he may appear before the Supreme State Government to obtain the evidence of his title to said property, since they are in legal quiet and peaceful possession of their respective lands. * * *' "

The "Legal Certificate of Title" or "Final Concession" from the governor of Tamaulipas, for which, in the concluding decree of the expediente the Ballis were judicially authorized to apply, is not in evidence. Those adverse to the State seek to account for its nonproduction in this way: Miller and Bourland, the

commissioners appointed to investigate titles to land situated between the Nueces and the Rio Grande, under the act of February 8, 1850, certified in their final report that Nicolas Balli and Juan Jose Balli had "obtained a title from the proper authorities." They also certified that all of the papers and original titles connected with the claims presented in Cameron County were lost by them in November, 1850, "in the unfortunate wreck of the streamer Anson while on her passage from the Brazo Santiago." The protocol of such a final certificate became an archive of the Tamaulipas records at Victoria, the state capital, which were destroyed by the French troops in 1864.

Those claiming adversely to the State offered in evidence the last will and testament of the Padre Nicolas Balli dated August 6, 1828, which is an archive of the municipality of Matamoros; a certified copy was recorded November 5, 1909, in the office of the county clerk of Cameron County, Texas, and provides as follows:

"Seventeenth: I declare as mine the agostadero (pasture land) of the Island of Santiago, which is composed of eleven leagues (sitios) of land; and which I have had surveyed and allotted, and which at present I am adjusting with the government of the State of Tamaulipas so as to obtain the titles thereto; and said agostadero should be divided in half with my nephew, Juan Balli, provided that he pays half the costs, a memorandum of which will be found in my account book. I so declare that may appear (be known).

"Eighteenth: I declare as mine a small farm (labor) for the breeding of horses and mules and I have in said agostadero of the Island of Santiago which I have given in halves for the term of three years to my nephew, Juan Jose Balli, in accompliance with a document which to this end was made and signed between us, and which will be found among my papers. I so declare that may appear.

"* * * *

"Twenty-seventh: I declare as my heirs my nieces and nephews Maria Josefa Balli, Juan Jose Balli, Rosa Maria Balli, Maria Guadalupe Balli, and Maria Concepcion Balli, the children of Francisco Balli, per stirpes, that they may divide among themselves my entire wealth, and may enjoy the same in equal parts, with the blessing of God; and I order that with such they must maintain their father, Jose Maria Balli, and that when he dies they must bury him with decency."

On January 19, 1830, Juan Jose Balli, by a Mexican notarial

act archived in Matamoros, and subsequently on October 11, 1883, recorded in the office of the county clerk of Cameron County, conveyed to Santiago Morales his original one-half of Padre Island, together with one-half league more that he had acquired by inheritance from his uncle, the Priest Nicolas Balli. At the same time his close kin, either in person or through an Attorney in fact, appeared before the notary and agreed that Santiago Morales might take his lands in the northern portion of the Island, while the other devisees of the priest should take their respective undivided interests from the remainder or southern one-half of the Island.

There is in evidence the will of a niece of Padre Nicolas Balli, of date May 13, 1833, archived in Matamoros and recorded in 1909 in the office of the county clerk of Cameron County, which recites:

"Seventh: I bequeath to my nephews and godchildren Antonio, son of Guadalupe, and Jose Maria, son of Rosa, the share that may belong to me in the pasture land of the Island."

Santiago Morales, on February 7, 1842, executed a document in the nature of a mortgage under the Mexican laws then in effect whereby he mortgaged the southern half of the lands on Padre Island acquired by him from Juan Jose Balli to Maria de los Dolores Garcia to secure the payment of $1111.32, Mexican money.

Santiago Morales, on July 17, 1845, by Mexican notarial act, a copy of which was subsequently recorded in the office of the county clerk of Cameron County, conveyed to Jose Maria Tovar the north half of the lands of the Padre Island acquired by Morales from Juan Jose Balli.

Rosa Maria Balli and Maria Guadalupe Balli conveyed to Nicolas Grisante their own share in three caballerias of land on Padre Island derived by them through inheritance from their uncle, the Priest Nicolas Balli.

Refugio Solis, on September 25, 1846, conveyed her interest in the island to Nicolas Grisante, with the same description as contained in the deed next amove mentioned.

Maria del Carmen Balli de Solis, as guardian, conveyed, on October 28, 1846, to Nicolas Grisante the interest of her three minor children.

Francisco Balli, as the father and guardian of his children, conveyed to Nicolas Grisante their interests, to whom the priest had devised one-seventh of one-half of Padre Island as the chil-

dren of said Francisco Balli. Jose Maria Tovar and Nicolas Grisante, on December 31, 1847, filed for record in the office of the county clerk of Nueces County a compulsa of the testimonio of the proceedings in behalf of Nicolas and Juan Jose Balli relating to Padre Island.

A report of the commissioners Bourland and Miller, in their final report to the legislature under their file No. 37, for Cameron County, recites:

"Nicolas Grisante and Jose Maria Tovar apply for 11½ leagues of pasture land called 'Padre Island' originally granted by the Spanish Government to one Nicolas Balli and subsequently confirmed to him and his nephew Juan Jose Balli by the Mexican Authorities. Witnesses proved the occupation of said tract of land by said original grantee and his nephew for the last fifty years; and that they kept thereon the requisite number of stock to entitle them to the grant of 11½ leagues, never having any adverse claimants, &c. They having obtained a title from the proper authorities and resided upon the land peaceably for a number of years, we recommend for confirmation 11½ leagues only to the heirs or assigns of the original grantee, for we feel confident that the island called Padre Island contains or embraces over thirty leagues of land. It is therefore to be understood that we recommended only 11½ leagues of said Island. For testimony in this case see File No. 37 Cameron County."

Said commissioners recommended for confirmation "11½ leagues only to their heirs or assigns of original grantee, for we feel confident that the island called 'Padre Island' contains or embraces over 30 leagues of land." The final report of the commissioners, with accompanying title papers and other evidence, was submitted to the governor as the act of the legislature of 1850 required, and was by him transmitted to the legislature for its action on each individual claim. This report was referred by the legislature to a select committee of the house and senate, which re-examined each claim and drew a bill which provided for confirmation of each of the grants recommended by Miller and Bourland, and for confirmation of a number of grants the commissioners had failed and refused to recommend. With regard to the grants thus recommended for confirmation the joint committee said:

"* * * In making their report, the Committee have been compelled to decide for themselves the following questions: Was there an original grant or title founded in good faith: Was it perfect, and if so, were its conditions subsequently complied with:—If imperfect, was it perfectable? Has the party claiming,

continued to possess the same, except when forced to abandon for good cause? (Such as incursion of Indians, etc.) Did the applicant erect fixed improvements, such as houses or jacals, fences, etc.?

" * * * * where the committee have been able to decide each of these questions affirmatively, they have reported the claim favorably. Therefore, bearing in mind, the law of the 8th of February, 1850, constituting said board; endeavoring to carry it into effect in letter and spirit; believing, moreover, that the State will be doing sheer justice to thousands of her citizens, around whom, heretofore, she has been unable to cast the arm of protection, we report the accompanying bill to confirm certain titles therein set forth, and urgently recommend its passage."

The legislature of Texas adopted the bill thus recommended as an act approved February 10, 1852. Gammel's Laws of Texas, Vol. 3, p. 941; Paschal's Digest of the Laws of Texas, Vol. 1, p. 734, Art. 4461. The act provided:

"That the State of Texas hereby relinquishes all her right and interest in the following described lands to the original grantees thereof, their heirs and legal assigns, towit: * * * Cameron County * * *.

"(12) Nicolas Balli and Juan Jose Balli eleven and a half leagues called "Padre Island': * * *"

The act thus adopted was identical with the bill recommended by the select joint committee, but with a proviso added in section 5 of the act as follows:

"Section 5. * * * Provided that nothing in this act shall be so construed as to relinquish the rights of the state to any of the Island or salt lakes situated in the territory embraced in this act."

The will of Jose Maria Tovar, previously registered in the archives of Matamoros, Tamaulipas, on February 25, 1855, was offered for probate in the county court of Nueces County, Texas, and by subsequent proceedings his interest in Padre Island which had been fully inventoried and described, was, by an agreement approved by the county court of Nueces County, partitioned among his heirs and devisees. By the terms of this partition one-half league or 2214 acres at the north end of Padre Island was set apart to Praejedes Tovar and Calixto Tovar, children of said Jose Maria Tovar, and the remainder of his interest in the north

half of Padre Island described in the order of sale as 11,785 acres in all, having first been surveyed, platted and subdivided into 24 lots of 485 acres each, except Lot No. 1, which contained 640 acres, was sold by the administrators under proper authority of the county court of Nueces County, Texas, to pay the costs of the administration and debts due by the estate. Said 24 lots were sold pursuant to the order of the court at Corpus Christi at public auction November 2, 1859, which sales were duly confirmed by the county court of Nueces County.

From and after the act of confirmation of February 10, 1852, Padre Island was shown and delineated as titled land on maps in the General Land Office by reference to the names of grantees and the act of confirmation as follows:

"(1) Map of the County of Nueces and portions of the adjoining counties, showing the locality, dates and claimants of the several grants made by the Governments of Spain and Mexico, compiled from actual surveys by Felix A. Blucher, District Surveyor, November 20, 1859.

"(2) Map of Nueces County, 1877.

"(3) Map of Nueces County General Land Office May, 1896.

"(4) Map of Cameron County, compiled and drawn by A. B. Langermann, General Land Office Austin, February, 1880."

The trial court rendered judgment for the adverse claimants to the State for the title and possession of Padre Island and described the same as containing 135,213 acres of land as the island was surveyed for the State by J. Stuart Boyles during the year 1941. The cause was appealed to the Fourth Court of Civil Appeals by the State and the judgment of the trial court of Nueces County was in all things affirmed. 173 S. W. (2d) 522-544. This court granted a writ of error because of the importance of the questions involved.

The State contends that the claimants, having admittedly failed to have a survey and the plats thereof and a return of such survey and field notes to the General Land Office, under Section 8, Article 14 of the Constitution of 1876, their claim "shall be forever barred." It was provided by Section 2 of the General Confirmation Act of February 10, 1852, in which the State relinquished unto the respondents' predecessors in title the title to Padre Island, that the same should be surveyed and a return of the field notes thereof to the General Land Office made, and that the Commissioner was authorized and required to have the same plotted on the maps of his office and issue patents therefor.

Section 8, Article 14 of the Constitution of 1876, provides:

"Persons residing between the Nueces River and the Rio Grande and owning grants for lands which emanated from the government of Spain or that of Mexico, which grants have been recognized and validated by the State by acts of the Legislature approved February 10, 1852, August 15, 1870, and other acts, and who have been prevented from complying with the requirements of said acts by the unsettled conditions of the country, shall be allowed until the first day of January, 1880, to complete their surveys and the plots thereof and return their field notes to the General Land Office, and all claimants failing to do so shall be forever barred, provided nothing in this section shall be construed as to validate any titles not already valid or to interfere with the rights of third persons."

■ The State's main contention is that on account of the claimants' failure to comply with the Relinquishment Act and the quoted provisions of the Constitution, the grant to Padre Island had been forfeited and all benefits from its legislative confirmation have been lost. It will be noted that the quoted section of the Constitution has never been considered by any of the appellate courts of this state. Provision was made for surveys, field notes and patents in terms similar, and in some cases identical, with those contained in Section 2 of the Act of Confirmation of 1852, in the Act of February 11, 1858, relinquishing the right of the State to certain lands in El Paso County. Clark v. Hills, 67 Texas 141, 2 S. W. 356. The Act of February 11, 1860, provided for adjudication of claims for land between the Nueces and the Rio Grande and in the Act of August 15, 1870, and for the adjudication of title to lands situated between the Nueces and the Rio Grande originating prior to December 19, 1836, State v. Sarnes, 47 Texas 323. The court says:

"The object of the survey required by the 8th section of the act, (of August 15, 1870) is to identify the boundaries of the tract of land previously surveyed, so that the surveys may be identified by appropriate calls, in connection, with or in reference to other surveys, or fixed and known objects, and be placed on the county map in the General Land Office. This could not be done without another survey, as there was no necessary connection kept up, in the Mexican plan of making surveys, but each tract was identified by calling for the name of a place informally, and sometimes by calling for an adjoining tract by its name."

It was recognized in Clark v. Hills, 67 Texas 141, 2 S. W. 356, that a similar section did not limit or impair the provis-

ion for confirmation in providing for a survey of the land. As was stated by the Supreme Court of the United States in Langdeau v. Hanes, 88 U. S. 521, 22 L. Ed. 606, speaking of a congressional act of confirmation containing a similar provision for a survey:

"In the present case the patent would have been of great value to the claimants as record evidence of the ancient possession and title of their ancestors and of the recognition of confirmation by the United States and therefore obviated in any controversies of law respecting the land the necessity of other proof and would thus have been to them an instrument of quiet and security. But it would have added nothing to the force of the confirmation. The survey required by the patent was only to secure certainty of description in the instrument and to inform the government of the quantity reserved to private parties from the domain ceded by Virginia."

A similar section in an act of confirmation was held to be remedial and for the benefit of the owner of the claim to land in the early case of Byrne v. Fagan, 16 Texas 391. The quoted section of the Constitution was written after the rendition of each of the cases cited above, and it is not unreasonably to be presumed that the framers of the Constitution, in writing that section, may be presumed to have had them in mind; thus the Constitution only applies to a valid grant; it applies only to the owners of grants emanating from the government of Spain and Mexico which had been expressly recognized and validated by the State. It is limited to owners "who have been prevented from complying with the requirements of said (validating) acts by the unsettled condition of the country." It does not apply to all grants from Spain and Mexico, as, for example, that construed in Clark v. Hills, 67 Texas 141, 2 S. W. 356, but only to those within the formal limits of the Mexican state of Tamaulipas. It was perhaps placed in the Constitution of 1876 for the purpose of relieving owners of grants of the specified class from which the effects of Section 4 of Article 13 of the Constitution, which was annulled after the adoption of the Constitution by the Supreme Court of Texas in Texas-Mexican Railway Company v. Locke, 74 Texas 370, 12 S. W. 80. We are of the opinion that the reason for this special remedy did not in any case apply to the grant in question. Only grants with uncertain boundaries needed additional surveys. Such resurveys, when made, have not been though important by the appellate courts of this state. See Corrigan v. The State, 42 Texas Civ. App. 171, 94 S. W. 95; State v. Corrigan, 94 S. W. 101; Sullivan v. The State, 41 Texas Civ. App., 89, 95 S. W. 645; Sullivan v. Texas, 207 U. S. 416, 52 L.

Ed. 74, 28 Sup. Ct. 215. We quote again from Clark v. Hills, 67 Texas 141, 2 S. W. 356:

"In cases where the grant of a former government is confirmed, the survey becomes important only when the land has not been previously surveyed, so as to segregate it from adjoining territory, or when the description of the land is so vague as to require a survey to designate and fix its boundaries with certainty."

The land in suit, as we have already pointed out in our statement of the case, is described as follows: "The barras (or inlets) of the Brazo de Santiago and Corpus Christi, the Laguna Madre and the sea." No survey was necessary to identify boundaries or to enable the Land Commissioner to plat them on his maps. As the evidence shows, the grant was so platted on the Land Office maps of Cameron and Nueces Counties both before and after the time limit prescribed in Section 8 of Article 14 of the Constitution of 1876. Failure to make surveys and file field notes as required by the second section of the Relinquishment Act of February 10, 1852, and by Section 8 of Article 14 of the Constitution of 1876 has never been accorded the slightest importance either by the political authorities of Texas or by the courts. See State v. Corrigan, 94 S. W. 101; Schaeffer v. Berry, 62 Texas 705; Haynes v. The State, 100 Texas 426, 100 S. W. 915. We are also of the opinion, as was suggested by the Honorable Court of Civil Appeals, that to construe the quoted section of the Constitution in accordance with the contentions of the State would necessarily raise serious constitutional questions. In the light of paragraph 2, Article 6, of the Constitution of the United States and certain other constitutional provisions, including those prohibiting the impairment of obligations of contract, the denial to any citizen the equal protection of the laws, and the taking of private property without due process of law and, as was remarked by Mr. Justice Bradley in Gonzales v. Ross, 120 U. S. 605, 30 L. Ed. 809, 7 Sup. Ct. 705:

"A man whose title was good in 1876, when the Constitution was adopted, whether his muniments of title were on record or not, could not be deprived of it by a simple ipse dixit of the Constitution, any more than by a legislative act."

██ It is an elementary rule, too well established to require the citation of authorities, that forfeitures are not favored in the law. The courts will, if possible, avoid them. It is not an unreasonable construction, in order to avoid the consequences of a forfeiture, to construe the section to mean that the owners of grants within the limited territory described "shall be forever

barred" from receiving a patent from the State of Texas if the surveys, etc., are not filed with the Land Commissioner by the time specified, towit, January 1, 1880. The denial of the patent to an owner of an earlier valid grant by the State of Texas would not be a taking of property without due process of law. This is obvious when we consider that the holder of a valid grant from a prior government can defend his title where called in question with all the evidence he has of his prior valid grant. But if the holder of a valid grant from a former government desired to have better evidence of his title, it could be obtained by a compliance with the requirements of the quoted section of the Constitution. Thus it is seen that for the expenses required to comply with the requirements of the Constitution the claimant of a valid grant was given a better evidence of his title. This was reciprocal in its nature in that the government, that is, the State of Texas, would give a patent its best evidence of a title in return for the owner of the grant giving to the government a correct survey, maps, plats, etc. The considerations of both enured to the holder of a valid grant and the State of Texas. In our opinion it would be violence to the language employed and to every rule of construction to hold that the framers of the Constitution meant that the holder of a valid grant to land would forfeit his ownership to the land by a failure to have the same surveyed and to file the field notes and plat of such a survey with the Land Commissioner of Texas. The case of New York & Texas Land Company v. Thomson, 83 Texas 169, 17 S. W. 920, relied upon by the State, deals with an unlocated land certificate. An unlocated land certificate is merely "the obligation of the government entitling the owner of it to secure the designated quantity of land by following the requirements of law." The effect of the Relinquishment Act of 1852 was "to recognize the validity of the Mexican grant and render the title perfect as against the State." Clark v. Hills, 67 Texas 141, 2 S. W. 356.

■ The State next contends through its third point that the lower courts erred in holding that the Texas legislature in Section 5 of the Act of February 10, 1852, did not refuse to relinquish title to Padre Island. The final clause of the general act of confirmation provides:

"Provided that nothing in this act shall be so construed as to relinquish the rights of the State to any of the islands or salt lakes situated in the territory embraced in this act."

The Legislature of Texas, at its first session after the proclamation of the treaty of Guadalupe Hidalgo, adopted an appropriate measure to give the treaty effect. By its act approved February 8, 1850, it provided for the investigation of titles to

land in the ceded territory emanating from the former sovereign, which by the terms of the treaty the new sovereign was bound to respect. Bourland and Miller were the commissioners appointed to make the investigation under the terms of this act. They visited the region affected, held stated sessions in the county seats of each of its counties, and called for and received applications for legislative confirmation of all legitimate grants entitled to the protection of the treaty, whether perfect or perfectable grants. The title papers and other proof of adjudication and possession were presented by the owners and examined by the commissioners. The commissioners made a detailed report on each application with their own recommendation to the legislature as to whether the claim should be confirmed as a perfect or perfectable grant. In a number of cases presented the commissioner's recommendation was qualified in some way. The report of the commissioners, with accompanying title papers and other evidence, was submitted by them to the governor as the act required and was transmitted by the governor to the legislature for its action on each individual claim. The report of the commission was referred by the legislature to a select committee of house and senate, which re-examined each claim for confirmation on its own merits and drew a bill to provide for unqualified confirmation of each grant recommended by Miller and Bourland and for the confirmation of a number of grants the commissioners had failed or refused to recommend. This bill was enacted by the legislature without change except for the inclusion of the proviso here discussed. In earlier legislation of that period the legislative intent in adopting the proviso is made to more clearly appear. On December 19, 1836, the congress of the Republic of Texas enacted a joint resolution authorizing the president to borrow $20,000.00, issuing land scrip therefor. The third section of that resolution reads:

" * * * that all Islands belonging to this Republic shall be, and are hereby reserved for the Government use, except the President be authorized specially by Congress to sell them." Hartley's Digest, Art. 1779, as quoted in the case of State v. Delesdenier, 7 Texas 76, loc. cit. 102.

On June 8, 1837, it adopted an act for the relief of James Erwin and others (Hartley's Digest, Art. 1810), the object of which was to discharge a debt contracted by government by means of the sale of land scrip. This act contained the proviso:

"Provided, that no lands granted by the Government shall be located on salt springs, gold or silver, copper or lead, or other minerals, or any Island of the Republic." Quotation from State v. Delesdenier, 7 Texas 76.

Section 2 of the act of congress of January 20, 1840, adopting the common law as the rule of decision, read:

"That all laws in force in this Republic prior to the first of September, 1836, (except the laws of the Consultation and Provisonal Government now in force, and except of lands in the State of Coahuila and Texas, and also such laws as relate to the reservation of islands and lands, and also of salt lakes, licks and salt springs, mines and minerals of every description, made by the General and State Government) be, and the same are hereby repealed."

These provisions of these early laws of the Republic have been construed and discussed by the Supreme Court in the following cases: The State v. Delesdenier, 7 Texas 76; Roberts v. Terrell, 101 Texas 577, 110 S. W. 733; Cox v. Robison, 105 Texas 426, 150 S. W. 1156.

Two lines of public policy existed, First, that land certificates issued under the ordinary land laws must not be located on islands belonging to the state, and that such lands are to be sold only by special law; and second, that title to minerals shall not pass without express words of designation by ordinary grant. Both policies were considered as being founded on the policy and laws of the preceding sovereign and the express policies that the legislature of Texas intended to continue in effect. The reservation contained in the final clause of the confirmation act of February 10, 1852, undoubtedly refers to the policies stated as regards both islands and salt lakes; policies which had been so often proclaimed by the acts of the Republic from 1836 on and which have been so recently re-examined and declared existing policies by the Supreme Court in the Delesdenier case. If the legislature believed, as it certainly did believe, that the public policy of the state was to continue the reservation of rights in the public lands which had originated under the former government and had not meanwhile been lost, it is easy to understand the intent and purpose of the final clause. The proviso, therefore, was intended by the legislature to protect the grants as made pursuant to the treaty of Guadalupe Hidalgo and to except from the relinquishment or quitclaim those rights the State had as a successor in sovereignty by virture of reservation of the former government. The legislature did this by using the same verbiage as that used by the congress of the Republic in the Act of 1840 adopting the common law. This is the only explanation that is consistent with the public policy the legislature has so often declared. If it does not account for the action of the legislature in adopting the proviso, then we have a case of a repugnance between the language of

the proviso and the express separate confirmation of Padre Island. It cannot be presumed that there was a legislative purpose to recognize and confirm the Padre Island grant as an individual grant in the first section of the act and then withdraw that recognition through a general exception in the last section of the act. An elementary rule of statutory construction applicable in such a case is that where a general provision of the same law, the special provision must prevail. Lufkin v. City of Galveston, 63 Texas 437; City of Austin v. Cahill, 99 Texas 172, 88 S. W. 542, 89 S. W. 552.

■ The State contends through its fourth point of error that the lower courts erred in holding that the proceedings had in 1827-1830 with the former government vested the Ballis with either title or the right to secure title of the character protected by the treaty of Guadalupe Hidalgo. This contention is primarily grounded upon the fact that the land in suit is situated within ten leagues of the sea and under the fourth article of the General Law of Colonization of the Republic of Mexico of 1824, which requires the previous approbation of the supreme executive power. The State relies upon the cases of Edwards v. Davis, 3 Texas 321; Republic v. Thorn, 3 Texas 499, and subsequent cases following, and League v. Egery, 24 How. 264 16 L. Ed. 655 and Foote v. Egery, 24 How. 267, 16 L. Ed. 656, and Christie v. Pridgeon, 71 U. S. 196 204, 18 L. Ed. 322.

It is true that no final certificate of title from the governor of Tamaulipas was produced on the trial. Whether or not it ever issued in a question of fact. The respondents rely upon the following facts to show that a final certificate was issued: that on January 19, 1830, Juan Jose Balli conveyed to Santiago Morales his original one-half of Padre Island, together with one-half league more than he had acquired by inheritance from his uncle, the priest Nicolas Balli. On March 20, 1830, Santiago Morales appeared before the first judge of the ayuntamiento of Matamoros and pleaded that he had been advised by "two gentlemen from Victoria" that the grant from the state would not be given effect and that he did not wish to involve his money during the one or two years that might be required to clear the title, therefore he desired that Balli should return to him the seven hundred pesos he had paid as purchase money, with the understanding that when Balli had cleared his title the sale to the Morales should, if he so wished, be given effect. Balli in effect answered that he was "not in accord with the two gentlemen from Victoria," but rather than litigate with Morales he would return the purchase money if Morales desired. February 7, 1842, Morales mortgaged to Dolores Garcia the south half of

his lands on Padre Island acquired from Juan Jose Balli. On July 17, 1842, he conveyed the north one-half of his said lands to Jose Maria Tovar. On September 4, 1848, Morales, acknowledging nonpayment of the debt secured by the Garcia mortgage and in compliance with its terms, conveyed the south half of his said lands to Jesus Garcia, son and heir of Dolores, the deceased mortgagee. It may be inferred from these proceedings that Balli cleared his title to the satisfaction of Morales. This would have been done by taking out the final certificate of title for which he was judicially authorized to apply. In the recommendation made by Miller and Bourland it is said:

"They (Nicolas and Juan Jose Balli) having obtained a title from the proper authorities, and resided upon the land peaceably for a number of years, we recommend for confirmation 11½ leagues only to the heirs or assigns of the original grantees."

Final certificates of title were frequently issued by the state authorities of Tamaulipas apart from the expediente of proceedings for the grant. State v. Bustamente, 47 Texas 320; Haynes v. State, 100 Texas 426, 100 S. W. 912; Kenedy Pasture Co. v. State, 111 Texas 200, 231 S. W. 683. The state archives of Tamaulipas were destroyed by the French troops in Victoria in 1864. Haynes v. State, 100 Texas 426, 100 S. W. 912; Kenedy Pasture Company v. State, 111 Texas 200, 231 S. W. 683; and State v. Sais, 47 Texas 307. It has been held in this state that where proceedings for a grant have progressed to a point where the grantee is entitled to demand it, mere issuance of final certificate by the governor is a ministerial act. State v. Bustamente, 47 Texas 320; State v. Gallardo, 106 Texas 274, 166 S. W. 369; Corrigan v. The State, 42 Texas Civ. App., 171 94 S. W. 95; State v. Corrigan, 94 S. W. 101; Haynes v. The State, 100 Texas 426, 100 S. W. 912. These same authorities hold that a title good against the Mexican government on December 19, 1836,, is good also against the State of Texas, even though final certificate of title has not issued and even though the proceedings were otherwise incomplete. It has also been held, under facts analogous to those proved in this case, that previous assent of the Mexican supreme executive will, if needed, be presumed. In the Sais case it is said:

" * * it is to that extent an imperfect title to the land claimed (It is recited no act of juridical possession and contained no final concession or certificate of title from the governor of the state.) It shows, however, the adjudicated right of the applicant, and the setting apart and survey of the land, with defined boundaries, and its locality and extent, and that the money at which it was valued under the law ($30) was paid into the treasury of the

State, with the regularity and legality of the proceedings, and direction for their completion, by the attorney of the treasury, sanctioned by the order of the Governor. * * *

"* * * So far as it appears from the record in this case, the right of the grantee, as a party entitled to land, had been properly established, and the land had been selected and surveyed, with defined boundaries, previous to the 19th of December, 1836, and it was, therefore, such a right as could, and reasonably would, have been protected, had there not been a change of government."

In the Bustamente case, 47 Texas 320, and companion cases, this court held that "final concessions" or certificates of title issued by the governor of Tamaulipas February 2, 1848, were illegal and void and each of eight claimants so situated was refused confirmation in suits brought by the owners under the Act of August 15, 1870. Suits brought later by the state to recover these same grants were decided by this court in Haynes v. State, 100 Texas 426, 100 S. W. 912. The court say:

"The learned judge who wrote the exhaustive opinion of the Court of Civil Appeals said, in substance, that the facts found by that court would justify the presumption that a grant had been made by the Governor of Tamaulipas, if it were not shown by the testimony that the Governor of Tamaulipas had issued a final title to Zapata, which was void, because he had not the power to do so at the time that it was granted. The issuing of the final title, without authority, could not affect the right which existed, and upon which the unauthorized act was based. (State v. Bustamente, 47 Texas 320). Therefore, discarding the title issued by Canales, Governor of Tamaulipas, in the year 1848, we have the facts still existing which, if sufficient to justify a presumption of a grant, must be sufficient to establish a right to the grant. If, therefore, the evidence introduced upon the trial shows that Antonio Zapata was, on the 19th day of December, 1836, entitled to have a grant issued, the State ought not to recover the land in controversy, because such a title would be protected by the treaty of Guadalupe Hidalgo."

And in the Gallardo case, 106 Texas 274, 166 S. W. 369, the court say:

"* * * we do not deem it necessary to re-open the question urged by the able counsel for the State as to whether property rights within the territory over which the sovereignty of Texas was extended, were within the protection of the treaty of Guadalupe Hidalgo. That in relation to such rights that treaty has the

force of law in Texas, has been repeatedly affirmed by this court. State v. Sais, 47 Texas 307; Clark v. Hills, 67 Texas 141; Haynes v. State, 100 Texas 426, 100 S. W. 912. We furthermore regard it as established in this State under these decisions and others and in the light of the State's legislation, that a title to lands within the original Mexican State of Tamaulipas and the present boundaries of Texas that was good as against the Mexican government on December 19, 1836, the date of the Act of the Congress of the Republic defining the boundaries of Texas so as to include that territory, is within the protection of the treaty and entitled to recognition in the courts."

With respect to the presumption of the prior approbation of the supreme Mexican government, it was further said:

" * * * the State urges the invalidity of that sale under the Mexican law upon the ground, it is said, of the want of any authority in the Governor of Tamaulipas to order it in the absence of affirmative evidence of a previous approval by the supreme government. This contention is based upon provisions of the law of October 3, 1836, enacted or decreed by the Mexican assembly and certain regulations decreed by the President ad interim in its connection, particularly Regulation No. 13, to this effect: 'Until the attributes of the government and departmental boards in what relates to the Treasury, are declared by law (which was not done until April 7, 1857), said Governors shall make no sale of lands (fincas) or property (bienes) nor contracts nor extraordinary expenses for said departments, without the previous approval of the supreme government.' "

The court continues:

"In ordering the sale in question, the governor of Tamaulipas acted in his official capacity and under purported authority. His act was but the exercise of a power, not denied to him but recognized by the regulation quoted. The previous approval of the Supreme government was necessary, it is true, to its exercise under the provisions of the regulation. But the question that here arises is, should it not be presumed after this long lapse of years, in the light of our knowledge of the conditions that then obtained in that country, that such previous approval of the sale by the supreme government was given? We think so, under established principles in relation of the acts of public officers in their official capacity under purported authority, as to which legitimate rather than usurped authority is presumed. United States v. Peralta, 19 How. 343, 15 L. Ed., 678; Strother v. Lucas, 12 Pet., 410 9 L. Ed., 1137; Texas Mex. Ry. Co. v. Jarvis, 69 Texas, 541, 7 S. W., 210."

The same ruling was made in the case of Barrow v. Boyles, 122 Texas 416, 61 S. W. (2d) 783.

The second reason assigned by the State why no title or right to title was vested in the Ballis under the Tamaulipas proceedings is because it is claimed that the governing council of Tamaulipas did not approve the Ballis' application for a grant. It is true that in the expediente the council (consejo) indicated that it was dissatisfied with what had been done in the instructed dispatch because of some of the contradictions contained in it. However, the council stated:

"It may, if it is agreeable to your Excellency, permit the remaining requirements of the law to be taken until this matter is concluded."

Therefore, the very document which the State claims to be a disapproval indicates that it was the attitude of the council that the interested parties, if agreeable to the governor, might comply with all the requirements of the law as pointed out by the attorney general (fiscal) and that the matter might be concluded.

■ The State further contends that the proceedings as disclosed by the expediente were not had pursuant to Article 26 of Decree No. 42 of the Tamaulipas Colonization Statute of date December 15, 1826, in that the Ballis did not file their petition with the proper authorities within the term of forty days from the date of the publication of the law and that the island contained more land than was allowed to be granted under said laws. Section 26 of the Colonization Law of Tamaulipas of December 15, 1826, provides:

"Designators of land which in time of the ancient government did not perfect their adjudication shall present themselves to the respective authorities to continue its course according to the state thereof, effecting the same within the term of forty days from the date of the publication of this law, and on the contrary said lands shall be considered open to designation as vacant."

The respondents contend that proof to the contrary appears from the face of the Diego de Leon's petition to the governor of December 11, 1827, by which the expediente as archived was begun. Said petition shows that he had theretofore presented to the governor an incomplete testimonio of the judicial act and proceedings of a grant to Balli of "the Island of Santiago that terminates at the Corpus Christi Bar and consisting of 19½ leagues of land"; that he had searched the achives at Reynosa

for the protocol of such proceedings, which had not been found, from which he inferred that it may have been forwarded to the seat of government about the year 1800 when the Count of Sierra Gorda was governor; that he solicited a new copy of the form of the proceedings in the event that the expediente was in the archives of Victoria and if not, that his petition be considered a new denuncio of the same island. The Miller and Bourland commission, which sat at Brownsville in 1850, found: (a) that Nicolas Grisante and Jose Maria Tovar applied for 11½ leagues of pasture land called Padre Island, originally granted by the Spanish government to one Nicolas Balli, and confirmed to him and his nephew Juan Jose Balli by the Mexican authorities; (b) that witnesses proved the occupation of said tract of land by the said original grantee and his nephew for the last fifty years.

■ Under this record it cannot be doubted that the Padre Nicolas Balli was a designator of the land of Padre Island "in the time of the ancient government" nor that he presented himself to the respective authority to continue its course according to the Tamaulipas law. It is true that the date of the colonization law being December 15, 1826, and Diego de Leon's petition December 11, 1827, the period between these times is more than forty days, but, as has been recognized by this court, the forty-day period did not run from the date of the law, but from the date of its publication. In Houston v. Robertson, 2 Texas 1, loc. cit. 28, it is said:

"But under the former governments, it was an undoubted principle that the laws were of no binding obligation until after they were duly promulgated. * * * These decrees were transmitted to the inferior authorities, and by them published in their respective jurisdictions."

Quoting again from Mr. Justice Bradley in Gonzales v. Ross, 120 U. S. 605, 30 L. Ed. 809, 7 Sup. Ct. 705, 710.

"But the laws of the Mexican states did not take effect in any part of the country, until they were promulgated there; and as Dolores was situated in the present county of Kinney, about 200 miles from Monclova, and probably much more than that as the roads then ran, and as the means of communication, in that region at that time were difficult and dilatory, it is not probable that the Act of March 26, was promulgated at Dolores prior to the 18th of April."

The expediente before us shows that the interval between the

enactment of a decree at Victoria and its promulgation at Matamoros, according to the same reasoning as quoted above, would be at least several weeks. The fact that de Leon's petition was dated December 11, 1827, is not indicative of the fact that on the same date Balli presented himself to the Tamaulipas authorities in order to perfect his title. As a matter of fact, the petition attests that this was done prior to that date. In any event, whether or not the designator of land in the time of the ancient government presented himself before the proper authorities timely was for the officials of the State of Tamaulipas to decide and where, as here, the governor, on January 2, 1828, ordered a continuance of the proceedings, his action in so doing is conclusive after more than a hundred years. Hardiman v. Herbert, 11 Texas 656.

█ The State also contends that under the colonization law of the State of Tamaulipas an adjudication could not be made to an amount of more than 125,000,000 square varas (5 leagues) and that the grant is therefore void in this case. Article 25 of the Tamaulipas colonization law, among other things, limited an adjudication to the amount of 125,000,000 square varas. According to the official survey of the island the grant made by the state to the two Ballis was 11.15 leagues, amounting to an excess of 1.15 leagues. Section 31 of the colonization law provided that "more than two grants cannot be adjudicated to one individual and this should the increased number of his herd or flocks demand it of necessity. For any violation in these cases the State shall recover the ownership thereof." Construing these articles together it appears, therefore, that the officials of the state had the power to make two grants of five leagues each to one individual or, in the case of two individuals, twenty leagues could be legally granted. It is definite from the testimonio that Nicolas Balli asserted a claim under the ancient government. The law provided by Article 26:

"Designators of lands which in time of the ancient government did not perfect their adjudication shall present themselves to the respective authority to continue its course according to the state thereof, affecting the same within the term of forty days from the date of the publication of this law, and on the contrary said lands shall be considered open to designation as vacant."

There was no quantitive limitation of which we are aware under the ancient government. The vacant domain was the king's special perogative. Sheldon v. Milmo, 90 Texas 1, 21, 36 S. W. 413, 419, Acts of February 10, 1852 (3 Gammel's Laws 941, 947) where the legislature confirmed title to the San Juan de Carici-

tas, a Spanish grant situated in Cameron County, said to contain 106½ leagues. We are of the opinion that where the officials of the State of Tamaulipas, such as the governor, the members of the council and the attorney general or fiscal, did not make any objection to the amount of land granted to the Ballis, they considered such a grant as being in accordance with law and not contrary thereto. This conclusion is based upon the oft expressed rule that officers of former governments must be presumed to have acted within the scope of their powers unless the contrary appears. Jones v. Garza, 11 Texas 186. This presumption is peculiarly applicable where so much time has elapsed and the acts of the officers have not been challenged for such a great length of time.

■ The State contends that the grant in this case was void as proven by the adverse claimants to the State because the testimonio does not disclose that previous approbation of the general supreme executive of the Confederacy of Mexico had been obtained. The system of government set up in Mexico by the constitutive act of the Mexican federation, January 31, 1824, (I White's New Recop. 374) and by the federal constitution of the United Mexican States October 4, 1824 (I White 387) was in form a federal republic composed of pre-existing independent sovereign states which created it and entrusted to it parts of their sovereign powers. The federal republic was created, composed of constituent though not pre-existing states, and also with territories to which statehood was not then given. The constituent or integral states were declared to be free, sovereign and independent in so far as regards its internal administration, according to the rules laid down in this act and in the general constitution. (Constitutive Act, Art. 6). The general congress was given by the constitution (Art. 50, Sec. 30) the exclusive power to grant laws and decrees for the internal administration of the territories and "to dictate all laws and decrees which may conduce to accomplish the objects spoken of in the 49th article without intermeddling with the interior administration of the states." Thus Article 49 reads:

"The laws or decrees, which emanate from the General Congress, shall have for their object:

"1. To sustain the national independence, and to provide for the preservation and security of the nation in its exterior relations.

"2. To preserve the Federal Union of the States, and peace and public order in the interior of the Conferedation.

"3. To maintain the independent of the States among them-

selves, so far as respects their government according to the Constitutive Act and this Constitution.

"4. To sustain the proportional equality of obligations and rights which the States possess in point of law."

The constitutive act or the constitution made no declaration as to the ownership of the public lands in the several states. The State of Coahuila and Texas, in its constitution of March 11, 1827, declared that both ownership and full right of administration and disposition of public land within its borders were vested in the state. In Article 4 it declared:

"That in all subjects relating to the Mexican Confederacy the State delegates its power and right to the general congress of the same; but in all that belongs to the internal government and administration of said State, it retains its liberty, independence and sovereignty."

In Article 15 it declared that:

"* * * all kinds of vacant property within its limits and all intestate property without a legal successor shall belong to the State."

In Article 97 it is provided that the congress of the state shall have power to "enact what is proper for the administration, preservation and alienation of the property of the state."

It was observed in Chambers v. Fisk, 22 Texas 504, loc. cit. pp. 526 and 527, that:

"The general government, in recognizing the State of Coahuila and Texas, as organized under its constitution, conceded the right of internal administration, as effectually as though the states had first been free and independent sovereignties, and had by joint concessions, and agreements formed the Federal government. * * *

" * * * Here is an open, express claim of right to the vacant domain in the state, with the full power of disposition. These provisions of the constitution of the state are not annulled or controverted in any way by the general government, * * *."

Mr. Chief Justice Hemphill, referring to the General Colonization Law of Mexico of August 18, 1824, said, in the case of Republic v. Thorn, 3 Texas, 506:

"There was no pretense, however, on the part of federal gov-

ernment, that she could, by her own agency, colonize lands lying within the limits of a state, without previous purchase from, and a consequent assent of, the state authorities. * * * the property in the soil is virtually acknowledged to be in the state * * *."

The same view was recognized by this court in the refusal of a writ of error in the case of State v. Palacios, 150 S. W. 229. No restriction or limitation made by the general congress upon the power of the states to alienate any public domain within their borders at their own free will could be given effect unless the particular state can be shown to have consented to the attempted limitation or restriction made by the general congress, in the Colonization Law of Mexico of August 18, 1824, (Sayles' Early Laws, Art. 40). The federal congress lays down a scheme of colonization within the Republic. It undertakes to colonize conformably thereto the territories of the Republic, which it afterwards provided for in the general rules and regulations of November 21, 1828 (Sayles' Early Laws, Art. 41). It enjoined upon the legislature of the several states that they should, as soon as possible, make colonization laws or regulations for their respective states, conforming themselves in all things to the constitutive act, the general constitution and the regulations established in the law. This decree contains several provisions limiting the several states in their right to dispose of the public lands within their borders. One of these, Article 12, is a limitation on the quantity of land that may be granted to an indiviual. This limitation was held to be beyond the federal power after full organization of the states in the case of Chambers v. Fisk, 28 Texas 504, and to be merely recommendatory on the state government. Another limitation is contained in Article 4, reading:

"4.—Border and Coast Leagues.—There cannot be colonization any lands comprehended within twenty leagues of the limits of any foreign nation, nor within ten leagues of the coasts, without the previous approbation of the general supreme executive power."

Undoubtedly the general congress possessed the power to permit, limit or prohibit the entry of foreigners into Mexico, and to designate the localities in which they might reside while their foreign status continued. This marked the constitutional limits of the federal power over the public lands in the organized states. The power of the federal government was of course unlimited in regard to the lands situated within the territories. The State of Coahuila and Texas enacted three different laws on the subject of colonization and the disposition of Texas public domain, viz: Decree No. 16, Colonization Law of March 24,

1825 (Sayles' Early Laws, Art. 47) ; Decree No. 190, providing for the settlement of vacant land, April 28, 1832 (Sayles' Early Laws, Art. 58) ; and Decree No. 272, providing for the sale of public lands at auction March 26, 1834 (Sayles', Art. 66). These decrees were examined in 1848 by the Supreme Court in the cases of Goode v. McQueen's Heirs, 3 Texas 241, Edwards v. Davis, 3 Texas 321, and Republic v. Thorn, 3 Texas 499. The first two laws were directly involved. The third was discussed with them because it was differentiated.

The State of Tamaulipas during that period enacted two laws on the subject, the general Colonization Law of Tamaulipas of December 15, 1826, (Sayles' Early Laws, Vol. 1, p. 132) and the general Colonization Law of November 17, 1833 (Sayles' Early Laws, 1, p. 138).

Decree No. 16, the Colonization Law of March 24, 1825, of Coahuila and Texas, provided in Article 7 as follows:

"Art. 7.—Border and Coast Leagues.—The executive shall take care that within twenty frontier leagues bordering on the United States line and ten litteral leagues from the coast of the Gulf of Mexico, within the limits of the States, no other settlements shall be made than such as shall meet the approbation of the executive of the Union, to whom all future petitions on the subject, accompanied by a corresponding report, shall be transmitted."

Thus the consent of the state to the application within the limits of Article 4, General Colonization Law, is plainly expressed. The State of Coahuila and Texas here undertakes and commands its executive to prevent any settlement whatever, whether by Mexicans or foreigners, and to issue no title to such property within the restricted area unless and until the settler's application for title shall have been submitted with the proceedings thereon to the executive of the union and his approval had thereon. It was only after such approval by the supreme executive that title could lawfully be issued by the state executive and the applicant placed in possession. The federal government could have prevented the immigration of foreigners into this or any other region it chose to designate under its clear constitutional powers and without this state law. So long as this state law remained in force the grant of public lands in the border or coastal leagues made by the state executive without obtaining the prior approbation of the president of Mexico was necessarily void because the power to make such a grant, even

to a Mexican citizen, had been especially withdrawn by the state itself from the general powers of its executive.

Decree No. 190, the state law of April 28, 1832, repealed the law of March 24, 1825, and substituted therefor a similar act, the prohibition of old Article 7, being limited to settlers "not composed of two-thirds Mexicans." This was at least a partial withdrawal of the state's consent given by the earlier act, but in the main it left the prohibition in force.

Decree No. 272, the Act of March 26, 1834, abandoned all previous plans of laws of settlement of the public lands. It omitted all restrictions on the settlements of lands in the coastal and border leagues. In Section 32 it required the state executive to appoint commissioners who should at once issue titles "to the inhabitants of the frontier of Nacogdoches, and those residing east of Austin's colonies, to the lands they occupy." These lands were in the border and coastal leagues; therefore this act amounted to an absolute termination of the state's consent to the federal restriction. Indeed, it amounted to a command that in the cases mentioned in Section 32 state grants should at once be issued without the approval of the supreme federal executives.

In the three cases decided by the Supreme Court in 1848, supra, grants made or attempted under the Coahuila and Texas laws of 1825 and 1832, respectively, without a showing that the prior approbation of the supreme federal executive had been obtained, were held void, the lands of course being within the border or coastal leagues. But, the power of the state executive to issue such grants without such approval under the Act of 1834 was upheld. This is clearly summarized in the opinion of Chief Justice Hemphill in Republic v. Thorn, 3 Texas 499, wherein it is said:

"The title could issue alone from an officer of the state, but the approval of the president was an essential constituent of his power, and without which this portion of the public domain could not be rightfully appropriated. This condition in restraint of the general power of the state over the public lands was sanctioned and enforced by provisions in the state laws of colonization of March, 1825, and April, 1832, and in the commissioner's instructions of September, 1827. * * *

"This title was issued by virtue of the law of 1832; and by the terms of that, as well as by those of the national decree, the approbation of the president was essential to its validity."

And the court said, in Goode v. McQueen's Heirs, 3 Texas 241:

"It is not necessary here to inquire whether the restriction imposed on the granting power of the state by general government was the exercise of a rightful authority or not, because at the time the grant, in the case before us, was made, it was equally repugnant to the law of the state and the general government to make it without the approbation of the supreme executive of the republic. * * *

"At the date of the grant to the ancestor of the plaintiffs in the court below, the congress had never assumed to act on the domain within the border leagues, in any other way than in strict conformity with the colonization law passed by the constituent congress of the republic. Had the congress of the state passed a law for the settlement of this land on the border, and authorized its executive to have granted the same to new settlers, it might have been well questioned whether the judicial tribunals of the state could have adjudicated such act to be unconstitutional and void, on the ground of its repugnancy to the federal constitution. It would have presented a case of conflict between the political authority of the state and federal governments; and it might have been insisted that it would have to be settled between them, and was beyond the control of the judicial tribunals to say that the state legislature had transcened its powers."

It was further pointed out that both the constitutions of the Republic and of the State of Coahuila and Texas reserved to the legislative department the interpretation of the constitution. In Article 165 the federal constitution reads:

"Congress alone has the right to interpret the Constitution in doubtful cases."

And in the state constitution, Article 97, the congress is given power "to enact, interpret, amend or repeal the law relative to the administration and internal government of the State in all its branches," and in Article 172 it is directed that "the tribunals and courts of justice being authorized solely for applying the law, shall never interpret the same nor suspend their execution."

The court then proceeded:

"If, then, there had been an act of the state legislature that gave a right of property to the grantee, without reference to the approbation of the federal executive, it forming a rule of property, I would not feel myself authorized to say that it was void

because repugnant to the general colonization law of the republic. It not being repugnant to our constitution of the republic of Texas, nor inconsistent with our present institutions. I would not feel myself authorized to withhold the benefit of the act of the legislature of Coahuila and Texas from the plaintiffs below, if it would sustain the grant under which they claim title, * ** . There can be no doubt that the acts of the congress of the state of Coahuila and Texas, so far as they are applicable to contracts executed and completed, and to rights consummated, derived from the former government by those who were citizens of Texas at the date of the declaration of independence, must in general, be regarded as the law of property; and that any supposed repugnancy of the acts of congress to the state constitution, or to the constitution of the republic of Mexico, cannot be considered; that they are still in force, unless they have been abrogated and annulled by the constitution of the republic of Texas; or are otherwise repugnant to, and incompatible with, the laws and institutions of the new government."

The court's comments, as quoted above, were made the basis of the decisions in Blount v. Webster, 16 Texas 616, when the court had before it one of the state grants in the border leagues made under the state law of 1834 without obtaining the approbation of the supreme federal executive, the court holding that since the ruling in the Blount case such grants under the law of 1834 were valid. This rule has been consistently followed in all cases arising under the act of 1834, including Johnson v. Smith, 21 Texas 722, Johnson v. Shaw, 41 Texas 428, and Cowan v. Williams, 49 Texas 380. The rule announced in Goode v. McQueen's Heirs that similar grants made by the state under the earlier laws of 1825 and 1832 were void unless the prior approbation of the federal executive was obtained and proven. The United States Supreme Court followed the same rule as local law constituting a rule of property in Texas in all cases arising under said prior laws of 1825 and 1832. League v. Egery, 65 U. S. 265, 16 L. Ed. 655; Foote v. Egery, 65 U. S. 267, 16 L. Ed. 656; Christy v. Pridgeon, 71 U. S. 204, 18 L. Ed. 322. Some of those cases referred to the different rule established in the case of grants issued under the law of 1834. That law, said the court in Smith v. Power, 14 Texas 146, had created a different rule of property which had been acquiesced in by the Congress of Mexico so that titles issued under that law could not now be held null and void.

The State of Tamaulipas had but one law of colonization, that is, the one of December 15, 1826, at the date of the grant

in this case. That law commanded the state executive to take care that all the vacant lands were promptly colonized without anything to delay or paralyze the proceedings. The exception made to this general command was embodied in Article 11, reading as follows:

"Art. 11.—Littoral and Border Leagues.—In the same manner he shall take care that no town projected by foreigners be situated within ten littoral leagues upon the coast of the Gulf of Mexico, within the ·limits of the State, without previously obtaining the consent and approbation of the supreme executive of the Union. Beyond said line he shall also take care that, so far as the sites permit, the new towns be established in contact with the present ones, and with the conditions he stipulates with the empresarios."

Here in express terms the state congress consented to a federal restriction on its power to grant lands within the coast leagues. This consent, however, was expressly limited to the case of the establishment of "towns projected by foreigners" in that area. The federal restriction was within the constitutional power of the general congress. The state's consent, if needed, was clearly given to the restriction thus expressed. It cannot be extended to a general restriction or settlement within that area either by citizens of Mexico or by foreigners.

The State insists that the decisions in the cases of Blount v. Webster, 16 Texas 616, Cowan v. Williams, 49 Texas 380, and Johnston v. Smith, 21 Texas 722, which involved grants from Coahuila and Texas made by commissioners under the act of March 26, 1834, were held to be valid on the theory that the approbation of the president of Mexico was shown through resolutions of the general government dated in April and August, 1828. We are not in accord with this view. Those cases, as the opinions in them reveal, were decided upon the proposition that grants made by authority of the land law of Coahuila and Texas of March 26, 1834, were valid without the previous approbation of the supreme executive of Mexico. This conclusion is clearly shown to be correct by the use of the following language contained in the Johnston case. (21 Texas 722):

"The grant, under which the plaintiff claims, was issued by the Commissioner Smyth, under the 32d article of the law of the 26th of March, 1834; and the decision of the court in the case of Blount v. Webster, 16 Tex., 616, has settled, in reference to grants of the character of the present, that neither settlement, nor *the consent of the federal executive of Mexico was necessary to their validity*. Smith v. Power, 14, Tex. 146." (Italics ours).

The case of Cavazos v. Trevino, 35 Texas 133, involved grants made by the state authorities of the State of Tamaulipas and the land was situated within ten leagues of the coast. The grants involved were held to be valid. The case seems not to have been noticed in any other opinion of this court except in the case of Wood v. Welder, 42 Texas 396, 408, where the court commented:

"* * * that the title in question emanated from the State of Tamaulipas and may possibly be distinguishable from similar titles from the State of Coahuila and Texas, * * *.;"

The opinions of the court at the time of the decision in Trevino's case seem to have been rarely cited as authority in this state. We cannot subscribe to some of the reasoning contained in the opinion, but it seems clear to us, for the reasons hereinbefore stated, that a grant from the state of Tamaulipas of land situated within the border league is valid without the previous approbation of the supreme executive of Mexico being first obtained.

■ The State contends through its fifth, sixth and seventh points of error that the lower courts erred in awarding respondents title to the entire superficial area of Padre Island. The respondents contend that the grant include the entire island and was not limited to 11½ square leagues of land. The contentions of the State more specifically are that the proceedings as shown in the expediente disclose a grant, if valid, of only 11.15 leagues of land; that the act of the legislature which confirmed the grant was limited to 11½ leagues in Cameron County and none in Nueces County; that the State is entitled to recover the excess over the amount actually granted and that the grant to 11.15 leagues is void for indefiniteness and uncertainty in that there is now no way to identify the land which was intended to be granted and to separate it from the land not intended to be included within the grant. In all the proceedings as disclosed in the expediente and other documents pertaining to the land, as shown in the record, the island is said to be bounded by the pass or barra of Corpus Christi on the north, by that of Brazo de Santiago on the south, on the west by Laguna Madre, and on the east by the sea. Nicolas Balli asserted in 1811 that his claim was to the agostadero or grazing land of "La Isla" (the island) which he asserted had been surveyed and adjudicated. Through his attorney in fact he asserted that he had theretofore presented to the governor an incomplete testimonio of proceedings for a grant, the original of which may have been forwarded to the seat of government about the year 1800, and made applica-

tion for a grant of the land of the island of Santiago. And again, for the land of the island of Santiago that terminates at the Corpus Christi Bar and consists of 19½ sitios. The governor stated, on January 2, 1828, that the surveyor "shall proceed to the visual inspection and survey of the island of Santiago." The judge of the second instance at Matamoros, on February 8, 1828, in directing the survey and visual inspection, ordered a survey and demarcation of the land of the island of Brazo de Santiago. The judge further certified that he had notified those residing near the Brazo de Santiago that such survey was to be made and "there not appearing any opposition to the right of possession of said island of Corpus adjacent to the Brazo," and on February 20, 1828, the judge certified:

"Having concluded the visual inspection of the lands and islands called Brazo de Santiago * * *. The visual inspectors and other members of the committee were examined closely."

On March 5, 1828, the judge officially certified that the surveyor appointed by the governor of the state, as well as by the persons who denounced the said island, presented the analytic report, or plan demonstrativo, "and the calculation of said land consists of eleven sitios for large stock and six caballerias of land." The demonstrativo is officially captioned:

"Democtrative Plan of the Island of Santiago, denounced uniformly by the ecclesiastic Citizen Nicolas Balli, and his nephew, Juan Jose Balli * * * to whom said island belongs, which lies between the sea and the Laguna Madre. Its length from south to north consists of thirty nine leagues and eighty five codeladas. Its width from East to West at its widest portion is fifty nine cordeladas diminishing toward each end in unequal proportion until it ends in an angle, following the bends and curvatures formed by the shores of the sea and the Laguna which causes the uneven width of the land. This Island contains eleven sitios for large stock and six caballerias."

The surveyor's field notes of the survey were included within his plan demonstrativo and map. The consejo or council reported June 7, 1828:

"The lands of the Island of Brazo de Santiago which the Citizen Bachelor Nicolas Balli denounced as ancient possessor and which the Government has adjudicated to him and his brother (should be nephew) Juan Balli, have been duly surveyed."

The appraisers in their report of July 21, 1828, referred to the land as the island of Corpus Christi, and on August 18, 1828, the judge certified to report their interests in the "islet (en-

senada) that is situated between the sea, Laguna Madre, Brazo de Corpus and Barra de Santiago, * * *." And on the same day that:

"* * * in order that I may execute what has been ordered by the Supreme Government, started the journey to the already mentioned point accompanied by the two experts named and by two assisting witnesses, without summoning adjoining owners as there were none at any time on that Island, which had always been in the possession of the Citizen Nicolas Balli, * * *."

And further:

"* * * they inspected the Island of Corpus Christi together with me, examining thoroughly its pastures, waters more or less of permanent nature * * *."

The judge further recited:

"Having concluded the present business with reference to the Island of Corpus Christi denounced by the Bachelor Don Nicolas Balli and his nephew, Juan Jose Balli, I, the Judge presiding of the official survey, state that in justice and truth the place where the survey began was opposite the Brazo de Santiago without mentioning any particular landmark for the reason that that tract of land is a banco ensenada or island, situated as already stated, between the Brazo de Santiago Bar, the Corpus Christi Bar, and Laguna Madre and the sea. For that reason, and because said land is entirely surrounded by water, there have never been any adjacent land owners at any time; but it only has been in the possession of its very ancient and first settlers who are those that have been duly cited. * * *"

The fiscal, or the attorney general, declared on March 17, 1829, with reference to the denouncement of lands made by the citizens Nicolas and Juan Jose Balli, residents of Matamoros, of the lands situated in that jurisdiction known as the island of Santiago having been concluded, "It remains now only to deposit the price of eleven (11) sitios and six (6) caballerias which were surveyed * * *." The second judge at Matamoros recited December 15, 1829:

"Let the Citizen Juan Jose Balli be cited to appear for himself and as heir of the deceased Priest Nicolas Balli, likewise all the heirs of the said Padre Balli who are entitled to half of the Island of Corpus to the end that they be given the corresponding possession with the formalities provided by law."

And in the same decree:

"I commanded to appear before me * * * the Citizen Juan Jose Balli so that he might be given possession of the part belonging to him in the Island of Corpus; * * *"

And the party interested replied:

"* * * that he would empower, and to this effect he gave a Power-of-Attorney in favor of, his brother-in-law, the Citizen Rafael Solis, to the end that he should take possession, not only of the half of the Island that belonged to him, but also and in like manner of the other part to which he, the Citizen Juan Balli, was entitled as Executor."

With regard to the act of judicial possession, the judge declared:

"* * * I crossed over to the Island of Corpus, accompanied by the above mentioned parties, and standing on said land I proceeded to place in possession of the eleven (11) sitios for large cattle and six (6) caballerias, of which the Island of Corpus Christi is composed; being comprehended within it, the Island of this name, the place or site known as 'La Boquilla de Loma Alta', the 'Rancho de Buena Vista', 'El Devisadero', 'Los Sauces de San Jose', 'El Paso de San Augustin', 'La Piedra Enterrada del Palmerito' and 'San Juna de las Cruitas', 'Los Laurelitos', 'Carnestolendas' and Brazo de Santiago of which land the Citizen Rafael Solis took possession in the name of his principal, Juan Jose Balli, * * *."

The record contains other evidence which is equally strong as that contained in the expediente. It seems clear to us that under the record in this case Nicolas Balli and his nephew, Juan Jose Balli, sought to acquire, and the official of the State of Tamaulipas intended to cede to them, an entire island which they considered as an agostadero or natural enclosure, regardless of the area or quantity stated or any details of the official survey.

In the case of Veve y Diaz v. Sanchez, 226 U. S. 234, 33 Sup. Ct. 36, 57 L. Ed. 201, the court say:

"A tract may be so well known by name that it can be described and conveyed without other designation. And there are cases where, in the sale of a ranch, or of an island, or of a well-known plantation, the limits described by name have prevailed, when there was a discrepancy between it and the other descriptive terms set out in the same deed. Lodge v. Lee, 6 Cranch 237, 3 L. Ed. 210."

The grant in the case of Lodge v. Lee granted to Thomas Lee "all that tract or upper island of land, called Eden, lying and being in Prince George County (following with a specific description)."

It was definitely held that:

"* * * a grant of an island, by name, in the Potomac River, superadding courses and distances of the lines thereof, which on resurvey are now found to exclude part of the island, will pass the whole island."

See United States v. O'Donnell, 303 U. S. 501, 58 Sup. Ct. 708, 82 L. Ed. 980.

This court, in the case of State v. Gallardo, 106 Texas 274, 166 S. W. 369, held:

"The subject matter of the sale was a body of land having a distinct identity under the law and in fact, with a survey only necessary to define its exact boundaries."

It seems to us that the true rule applicable in this case is stated in Thompson on Real Property, Sec. 3100, as follows:

"A description of a tract of land by name only points to evidence aliunde showing the existence of a body of land generally known by the name designated, and such evidence is admissible to apply the name to the land intended. A grant of the land by such name passes the title to the entire tract known by that name. * * * In order for a general grant to be limited by a subsequent particular description such an intention must definitely appear from the terms of the particular description.

It cannot be doubted that the official surveyor was ordered to survey the entire island of Santiago or Corpus Christi, which the Padre Nicolas Balli and his nephew had denounced and which, subject only to inspection, survey and payment of dues, the governor of Tamalipas had adjudicated to them. The official surveyor and the judge in charge of the proceedings certified officially that the survey as directed was made. The judge's proceedings of survey and the surveyor's report and plan demostrativo were duly submitted to the council of government and by it found to be correct. The land had been denounced by the Ballis as 19½ sitios. This could have been based upon an earlier survey by the Spanish authorities. The fact that the surveyor of Tamaulipas measured the land as containing 11.15 sitios, the inference must be drawn that the Tamaulipas survey was on a different basis and that the authorities of Tamaulipas were interested in the number of leagues of pasture land the island

contained. The reports of the inspectors and of the appraisers made it clear that much of its area was rough land and contained many sand dunes. The official surveyor for the state of Tamaulipas ran a line approximately from north to south along the gulf shore of the island and at right angles and at intervals usually of 10,000 varas cross lines to the shore of the Laguna Madre. Had the shore lines been in fact straight lines, as it was undoubtedly assumed by the surveyor, his computation would have been approximately correct, but if the shore lines were irregular or curved along the course of his imaginary lines, his calculations would be approximate only. Regardless of the details of the survey or possible errors in calculations, the record exhibits, in our opinion, a clear intent on the part of the officials of the State of Tamaulipas to cede the entire island. As we have pointed out above, under Section 23 of the Colonization Law of the State of Tamaulipas in effect at the time these proceedings were had, the amount to be paid to the state for the lands adjudicated to them was determined from the kind of land involved, such as grazing land, uncultivated or woodland. So where, as in this case, the adjudication was of a specific tract of land well defined by natural boundaries, the only purpose of a survey was to ascertain the amount of money in dues to be paid the state. The visual inspection had judicially determined that the island contained no land suitable for cultivation and no wood land. Its only value was for pasturage. The only need, therefore, for the survey and for the visual inspection was to ascertain the amount in dues the grantees were required by law to pay. This was measured not by the number of leagues in the entire area of the island, but under the plain terms of the statute by the number of leagues of pasture land it contained.

This court, in refusing a writ of error in the case of Corrigan v. State, 42 Texas Civ. App. 171, 94 S. W. 95, approved the remarks of the court in speaking of the Tamaulipas grant of 1835. The court say:

"It was nothing unusual in that time and day, when the Ynojosa was originally granted, that the Surveyor General of the State of Tamaulipas, or of other states of Mexico bordering on the frontier, should so survey these original grants as to contain a large excess of land. The lands were regarded of little worth, and their principal value was for pasturage purposes. It is a fact, familiar to all who have had occasion to investigate original grants lying within that territory, that they generally contained a large excess."

In the case of Stover v. Gilbert, 112 Texas 429, 247 S. W.

841, involving a survey which called for the Brazos River, thence down the river following specified course and distances, which line ran actually at a distance from the river and generally parallel with its course except that due to a bend of the river there was a considerable departure at one place. It was held that it is not uncommon for field notes to be thus run so as to exclude the lowlands adjacent to a stream, but that such surveys should be construed to include the land to the banks of the river, following the rule stated in 9 C. J. p. 189. See Oklahoma v. Texas, 268 U. S. 252, 45 Sup. Ct. 497, 69 L. Ed. 1057. We are of the opinion that doubts, if any, as to the extent and boundaries of a Mexican grant are resolved by the act of juridical possession. In the case of State v. Russell, 38 Texas Civ. App. 13, 85 S. W. 289 (writ refused) it is said:

"The two grants call for the Santanita as their south boundary line. In reaching this point the distance falls short when the surveys are constructed from the calls establishing the northern line of the surveys. The testimony shows that Canales, the surveyor general, who did the surveying in this instance, as a general thing so located grants as to create an excess * * *. If there should be any doubt as to which of the calls should prevail, that for course and distance or that for the north line of the Santanita, it should be resolved in favor of the long-asserted right under the juridical possession which is shown in this case. * * * There is some evidence relating to the act of juridical possession which would justify the conclusion that it extended to the north line of the Santanita; and whatever doubts as this late date could be indulged in with reference to which of the calls should prevail, should be resolved in favor of that construction that would include and embrace the land determined by the act of juridical possession."

In the case of State v. Sais, 47 Texas 314, the procedure was outlined which the congress of Tamaulipas in Decree 24 of the 19th of October, 1833, required under its law. Under the earlier laws of Tamaulipas the procedure was substantially the same. We have found no instance of a grant by the State of Tamaulipas where the survey and visual inspection did not precede the act of juridical possession and the final concession of title, which is equavalent to a patent under the later Texas laws. The act of juridical possession has always been considered a judicial construction or interpretation of an earlier survey. Three types of Mexican grants have been passed on by the Federal courts. They include:

"(1) grants by specific boundaries where the donee was en-

titled to the entire tract; (2) by quantity, as of one or more leagues of land situated in a larger tract described by out boundaries where the donee was entitled to the quantity specified; and (3) grants of a certain place or rancho by some particular name either with or without specific boundaries where the donee was entitled to the tract according to the boundaries if given, and if not given, according to the limits of the tract as shown by the proof of settlement and possession."

Alviso v. United States, 75 U. S. (8 Wall.) 337, 19 L. Ed. 305, Higueras v. United States, 5 Wallace 827, 18 L. Ed. 469, Hornsby v. United States, 77 U. S. (10 Wall.) 224, 19 L. Ed. 900. The first type mentioned is more like the grants which emanate from the State of Tamaulipas. The cases of State v. Gallardo, 106 Texas 274, 166 S. W. 369, State v. Indio Cattle Co., 154 S. W. (2d) 308, 316, Johns v. Schutz, 47 Texas 578, and Clark v. Hills, 67 Texas 141, 2 S. W. 356, belong to the third type. We have not been cited to a case of a grant arising in the State of Tamaulipas which properly belongs to the second class.

■ In the case of Padre Island the act of juridical possession is clearly shown. The juridical possession was expressly ordered by the governor of the State of Tamaulipas and possession was given in the formality required by law by proper judicial officer of the jurisdiction in which the land was situated. It was not necessary for the surveyor in this case or the judicial officer to erect any monuments, for the reason that the land was an island bounded on the north, east, south and west by the sea. Whether the State of Tamaulipas had a right to recover any excess is not necessary for us to determine. It is enough to say that whatever right remained in the State of Tamaulipas, if any, passed to the State of Texas, and that such right was expressly relinquished to the owner of the island by the Act of Confirmation of February 10, 1852. This conclusion necessarily follows from the ruling made by this court in the case of Clark v. Hills, 67 Texas 141, 2 S. W. 356.

■ The State contends through its last three points of error that the lower courts erred in allowing the respondents a recovery of the land as described by the field notes made by surveyor Boyles. The contentions of the State involve the ownership of accretions to the island and the location of the tidal boundary line of the same. It is asserted that at the time of the grant, under the law of Tamaulipas, accretions by the sea became the property of the sovereign. The respondents contend that the law of accretion, erosion and alluvion in effect in the State of Tamaulipas at the time of the grant was practically

the same as the rule of the common law and that all fast land above mean high tide which has formed on the shores of Padre Island since the grant belonged to the owners of the soil. The State primarily replies upon cases arising under modern civil law codes. It is clear from the decisions of this court that the rights of the State and respondents must be determined in the light of the civil law in effect at the time of the grant as it existed in the State of Tamaulipas. Miller v. Letzerich, 121 Texas 248 49 S. W. (2d) 404, 85 A. L. R. 451, and authorities cited. It cannot be doubted that the law as incorporated in Las Siete Partidas was in effect in the State of Tamaulipas at the date of the grant. In fact, on September 21, 1821, when Mexico gained its independence, the Spanish municipal law was in effect and so continued until the state adopted its first civil code on June 29, 1871. The laws of natural accession, which include alluvion and accretion, are treated in Las Siete Partidas, 3 Partidas, Title 28, Laws 26, 27 and 28, pp. 827 et seq., 1931 Edition, Scotts' Translation. Law 26 in part provides:

"We decree that everything that rivers take from men, little by little, so that the amount of it cannot be ascertained because it is not all removed at once shall belong to the owners of the land to which it is untied, and that those from whom it is taken shall have no further interest in it."

The Spanish law was taken from the Institutes of Justinian, Book 2, Title 1, Section 20, which has been translated as follows:

"Moreover the alluvial soil added by the river to your land becomes yours by the law of nations. Alluvion is an imperceptible increase; and that is added by alluvion which is added so gradually that no one person can perceive how much is added at any moment of time."

The rules of alluvion and accretion of the English common law and the Spanish civil law have their origin from this text in the institutes. The text from the institutes does not mention accession from the sea, but only rivers. The same is true of the text of the Partidas. The question arises as to whether the mention of rivers (in the texts) is to be considered as an example which illustrates a general principle of law or whether the rule stated in the texts is to be applied only in cases of rivers. Roman law commentators entertained the view that the rule applies to all alluvion and that rivers were mentioned as a declaration of a general principle of law.

In England it was decided by the House of Lords, in the case of Rex v. Yarborough, 2 Bligh N. S. 147, English Reprint, Vol. 4, p. 1087, that additions by accretion and reliction along the seashore become the property of the adjoining owner. That decision was followed by the Supreme Court of the United States in St. Claire County v. Lovingston, 23 Wall. 46, 23 L. Ed. 59. In Spain there was no preservation of judicial rulings in adjudicated cases. Dr. Joaquin Escriche, a noted Spanish commentator, in "Diccionaria de Legislacion y Jurisprudencia, word Alluvium, p. 149, said:

"The alluvium that the sea adds to properties situated on its shores, belongs also by the right of accession to the owners of said property, who are authorized to construct dikes in order to preserve it."

And he defines natural accession, id. p. 43, as:
"The right to which ownership in a thing gives us in what it produces, and above all what is accessorily united to it by nature alone, without the intervention of the work of man."

And by way of illustration:

"Ours is the increase of our land that the river adds slowly and insensibly to the fields we own along the river bank," citing 3 Partidas, Title 28, Law 26.

Amandi, in his Commentaries on the Civil Code of Spain, Vol. 2, p. 95, written after the Spanish law of accession had been twice modified by statute in 1866 and 1880, inquired:

"Do lands bounded by the sea enjoy the right of alluvion? Under our ancient law, it appears that the doubt must be resolved in favor of those owners whose lands were bounded by the sea."

In Spain this law was later modified by two enactments of the Cortes, the law of waters of 1866 and the law of ports of 1880. Those statutes cannot change the law in effect in Tamaulipas in 1825 and in fact cannot properly throw any light upon the law was in Tamaulipas at that time. Dr. Mariano Rubio, of the Universities of Barcelona and Madrid, has stated that both the Spanish and English laws of alluvion derive from Justinian's Institutes, Book 2, Title 1, paragraph 20, wherein it is said:

"By alluvion is understood a hidden increment and there is considered to be added by alluvion that which is added so slowly

that one cannot know how much in each space of time is added."

Although neither the Partidas nor the Institutes makes mention of seashore alluvion, Dr. Rubio continues:

"But this omission of the Spanish Law has no juridical control, because the principle of law applicable in Spain since time immemorial: Ubi lex non distinguit, nec nos distingere debemos, is here to be applied. The law does not distinguish between maritime and fluvial alluvion nor establish any rule which can serve as a basis for distinction, and the omission is due exclusively to the fact that alluvion in the sea does not give rise to lawsuits because, there, only one person is interested. The Roman Law, and consequently, the Partidas was elaborated on the basis of the solution of concrete cases, and these not having arisen covering maritime alluvion, no percepts of law exists."

Any distinction that can be drawn between the alluvion of rivers and accretions cast up by the sea must arise out of the law of the seashore rather than that of accession and be based, as suggested by Dr. Rubio, upon the ancient maxim that the seashore is common property and never passes into private hands.

The law of the seashore, like the law of accession, was originally derived in both of the great systems of jurisprudence from the Institutes of Justinian and the ancient Roman law. Thus the law of the seashore in effect in Tamaulipas when the grant in this case was made, like the law of alluvion and accretion, was that stated by Las Siete Partidas, which, as with the common law of England, differs in some details from the early Roman law. It is stated in Partidas 3, Title 28, Law 4, Scott's Translation, 1931 Edition, p. 820:

"And all that ground is designated the shore of the sea which is covered with the water of the latter at high tide, during the whole year, whether in winter or in summer."

In the Institutes of Aso and Manuel, (1 White's Recopilacion, p. 70) it is said:

"By the shore of the sea we understand whatever part of it is covered with water, whether in winter or summer."

The Institutes of Justinian, Book 2, Title 1, (Sandars Translation) declared the Roman law to be:

"1. By the law of nature these things are common to man-

kind—the air, running water, the sea, and consequently the shores of the sea. No one therefore is forbidden to approach the seashore, provided that he respects habitations, monuments and buildings, which are not, like the sea, subject only to the law of nations."

This percept of the Roman law, which makes the seashore common property and not public property, remains as a guiding principle in all or nearly all jurisdictions which acknowledge the common law and unless changed by code or statute, in all civil law jurisdictions as well. The law was changed in France in 1804. The first change was made in the Spanish law by the Spanish Law of Waters, enacted in 1866, together with the laws of accretions and alluvion, but there had been no change prior to the effective date of the Mexican·independence, towit, September 27, 1821.

Thus the seashore was no part of the land, but always an adjunct of the sea. The classification of the sea and the shore of the sea as common property is as old as the oldest Roman law, but by its very nature and meaning there could never be an accession to the seashore as the seashore was defined in the law of Spain, which was effective in Tamaulipas when the grant in this case was made. The seashore was defined to be "all that ground is designated the shore of the sea which is covered with water of the latter during the whole year, whether in winter or in summer."

Since there could be no accession to land below tidewater, any change in the tide line ipso facto changed the seashore. If the sea encroached and the upland owner lost his land, he had no redress; if alluvion formed adjoining the seashore, the latter receded with the tide line, and by the very nature of the accretion any new alluvion which formed above the tide line should become a part of the contiguous upland estate.

It was assumed by the Austin Court of Civil Appeals, in the case of The State v. Texas Land & Cattle Company, 34 Texas Civ. App. 460, 78 S. W. 957, that the rule of the common law as to accretions by the sea to land on the seashore belonged to the owner was the same in the case of a Spanish grant made in 1807. That case was by the State and was instituted by the Attorney general. It is to be assumed that the then attorney general entertained the same view. Writ of error to the Supreme Court seems not to have been prosecuted by the State.

The State presses the case of Ker v. Couden, 223 U. S. 268,

32 Sup. Ct. 284, 56 L. Ed. 432. The court in that case "was dealing with the law as it existed in the Philippines, not with that which prevails in this country, whether of *mixed antecedents* or the common law." (Italics ours). It seems to us that a construction of the Spanish Law of Waters, which was passed in 1866, could not possibly control the law in effect in the State of Tamaulipas in 1829, when the grant was made in this case.

We are not pointed to any action of the political authorities of the State of Tamaulipas which gives us any aid in arriving at a correct solution of the problem. Nor have we been cited to any declaration by any department of government upon the question involved. Thus we feel inclined to follow the rule which seems to have the concurrence of some of the great commentators (quoted above) and which in our opinion is founded upon natural justice, that accretions by the sea to the grant in question, under the law as it existed in 1829, belong not to the government, but to the owners of the upland estate.

■ There remains the question of the location of the boundary of the grant. The survey was based upon what the surveyor considered the line of mean high tide. The judgment of the lower courts was to the effect that the State had no interest in and to the lands enclosed by the survey. No survey was made of a line purporting to be the line of high winter tide. It is the contention of the State that the grant is limited by this line under the law in force in Tamaulipas at the time of the grant and that the State should have judgment for the land lying between the line of winter high tide and mean tide. The respondents contended in the Court of Civil Appeals, and make the same contention here, that the evidence is sufficient to support a finding that there is no substantial difference in fact between the line of high winter tide and the line actually surveyed by the surveyor Boyles. The Honorable Court of Civil Appeals reviewed the evidence and sustained the contentions of respondents. We are in accord with that view.

The judgment of the Court of Civil Appeals, which affirmed the judgment of the trial court, is affirmed.

Opinion adopted by the Supreme Court December 20, 1944.

Rehearing overruled November 7, 1945. *

MR. JUSTICE SHARP, dissenting.

This case is before us on motion for rehearing. After a care-

*Writ of certiorari to the Supreme Court of the United States, denied. ____ U. S. ____, 90 L. Ed. 1068, 1269; 66 Sup. Ct. 1341, 1363.

ful consideration of the motion I have decided to withdraw my original dissenting opinion and substitute therefor the following:

This case squarely presents the question whether respondents are entitled to receive 30½ leagues of land from the State, although the record shows that the surveyor's field notes regarding this land specified definitely 11.15 leagues; that the Ballis paid for only 11.15 leagues; that those who held under the Balli claim asked the State to confirm 11½ leagues; and that the State in order to carry out its obligations to such claimants confirmed 11½ leagues.

I think the majority opinion of this Court errs in holding that the State is not entitled to recover (1) the land on Padre Island in excess of the 11½ leagues of land, and (2) the land formed by accretion to Padre Island since the Ballis acquired their claim from the Mexican Government. I think the holding on the first point is clearly against the Act of 1852 and the records under which respondents claim this land. The holding on the second point is clearly contrary to the decisions and against the public policy of this State relating to accretion to islands.

At the outset I desire to make the following supplemental statement of facts: It appears that Nicolas Balli had some negotiations regarding land with the former Spanish colony of Nuevo Santander, which became the State of Tamaulipas under the organization of the Mexican Government in 1824. The general colonization law of the State of Tamaulipas, of December 15, 1826 (Sayles' Early Laws, Article 89) provided the method of obtaining title to land applied for under the former government. On December 11, 1827, Nicolas Balli, acting through his attorney in fact, presented to the Governor of Tamaulipas his petition for a complete testimonio of the earlier Spanish proceedings, or, in its absence, for a new title from the State of Tamaulipas. The land applied for is described in the petition as follows:

"For the land of the Island of Santiago that terminates at the Corpus Christi Bar and consists of 19½ sitios."

No proceedings by Nicolas Balli under the Spanish Government were found, and the application was considered as a new application by Nicolas and his nephew Juan Jose, jointly, under the law of Tamaulipas. The Governor on January 2, 1828, embodied in his decree the statement that neither the original proceedings nor the instructive dispatch had been found in the

archives of the government, and that he had determined that the Alcalde of Matamoros, after summoning the surveyor named by the Government, the Citizen Domingo de la Fuente, should instruct him to proceed with the visual inspection and survey of the lands of the Island of Santiago, and that other legal steps should be taken as provided for by law. Unquestionably respondents' claim for this land must rest on de la Fuente's survey.

On March 5, 1828, the judge in submitting Official Surveyor Domingo de la Fuente's report on said land stated that such land as shown by such report "consists of Eleven Leagues (sitios) for large stock and six caballerias of land of which said whole pasture consists, * * ."

That not much of the island was suitable for pasturage, and that it consisted largely of sand dunes, with salty bays in its shore, is amply supported by the reports made to the Mexican Government relating to the island.

This brings us to the report made by de la Fuente showing the method and manner of his survey of this land and the field notes of such survey made by him. He divided his survey into four Figures. The field notes of Figure One are copied below in order to show the method used by him. The following is quoted from his report:

"Demonstration.

"A.A.A.A.        F.F.F.F.

"The Figure and Extension of the island from North to South over A. B., First Figure.

"The cord was streached one hundred and ten times, and it entered the shore, from East to West over B. Y. the cord was stretched forty times and terminated on *the border of the Laguna,* and a triangle was formed that was one hundred and ten cordeladas of longitude and forty of latitude whose surface is five counts and five hundred thousand square varas which is what composes the Riccon de Corpus Christi. From north to south following the edge of the shore over B. C. the cord was stretched three hundred times and reached the site of Carnestolendas, from East to West over C. H. the cord was stretched fifty four times and a quadrangle was formed of three hundred cordeladas of longitude and forty of latitude whose square area is composed of forty counts and five hundred thousand varas, and because B. Y. is of forty cordeladas and C. H. of fifty four, a triangle is formed that also has three hun-

dred cordeladas of longitude and fourteen of latitude which is the difference between forty and fifty four, whose square area is five counts and two hundred fifty thousand varas; from C. to D, the cord was stretched two hundred and twenty five times, and it reached *to Los Laurelitos,* from East to West over D. G. the cord was stretched fifty nine times and a quadrangle was formed that has two hundred and twenty five cordeladas of longitude and fifty four of latitude, which compose ten counts and six hundred eighty seven thousand five hundred square varas, and because C. H. is of fifty four and D. G. of fifty nine a triangle is formed of two hundred and twenty five cordeladas of longitude, and five of latitude, on account of the difference between fifty four and fifty nine, which has a surface of one count and three hundred fifty six thousand two hundred and fifty square varas; over D. E. the cord was stretched one hundred and seventy five times, and it reached *to San Juan de las Cruicitas;* from East to West over E. F. the cord was stretched forty six times and another quadrangle was formed that has one hundred seventy five cordeladas of longitude and forty six of latitude, whose surface is of ten counts and two hundred fifty thousand square varas, and since E. F. is of forty six and D. G. of fifty nine there was formed a triangle that has one hundred and seventy five cordeladas of longitude and thirteen of latitude whose square area is two counts and eight hundred and forty three thousand seven hundred and fifty varas; over E. A. the cord was stretched two hundred twenty five times and it reached *to the Buried Stone of El Palmarito;* from East to West over A. T. the cord was stretched thirty three times and a quadrangle was formed that has a surface of eighteen counts and five hundred and sixty two thousand, five hundred square varas, and a trinagle that has of surface three counts and six hundred fifty six thousand two hundred and fifty varas, and the first figure was concluded. All its divisions aggregate ninety eight counts and six hundred and six thousand two hundred fifty varas." (Emphasis mine.)

He continued his survey on Figures Two, Three, and Four along the method used in his survey of Figure One. In those Figures he calls for certain definite points, as follows: "The pass of San Augustin," "The Willows of San Jose," "El Devisadero," Rancho de Buena Vista," "Boquilla de Loma Alta," and "Brazo de Santiago." He concludes his field notes by saying that "the cord was stretched thirty times and it reached to the Brazo de Santiago where the survey terminated in an angle." He sums up the result of his survey in the following language:

"The sum total amounts to two hundred and seventy eight

counts and seven hundred eighty one thousand two hundred fifty square varas. Which is eleven sitios for large stock, and six caballerias."

· The terms used by de la Fuente and others in the reports relating to this survey have been translated into English, and they have been interpreted and compared with more modern terms used by present day surveyors. For instance, a sitio is equavalent to a league of land; a caballeria is equivalent to a fractional part of a league; and a cord is equivalent to 50 varas. In other words, eleven sitios and six caballerias means 11.15 leagues of land.

De la Fuente attached to his field notes and report a map showing in detail the manner and method pursued by him in making such survey, as well as the distances and prominent points used to make such survey. It is worthy of notice that the map made by de la Fuente embracing the land claimed by the Ballis does not show the shore lines of Laguna Madre, and in making the calls contained in his field notes he projected from the shore line on the Gulf side, and he mentions the border of the Laguna only one time. It is undisputed that the Mexican authorities distrusted the correctness of the report made by de la Fuente, and commanded that the land be reinspected.

The colonization law of the State of Tamaulipas fixed the price of dry grazing land at $30 per sitio and that with running water at a greater price to be fixed by "two competent persons, chosen by the executive and the settler." 1 Gammel's Laws, 457; State v. De Leon, 64 Texas 553. The appraisers appointed, Manuel Garza by the Governor and Antonio Marcia Casas by the Ballis, fixed the price of land on the island at $40 per sitio or league. The purchase price paid, $446, was for 11.15 leagues at $40 per league.

On March 21, 1829, the Treasurer acknowledged the payment for this land in the following language:

"On this date there has been paid into the Treasury Four Hundred and Forty six ($446.00) Dollars that belongs to the State in payment of eleven (11) Sitios for large cattle (ganado mayor) and six (6) caballerias of land denounced by the Citizens Nicolas and Juan Jose Balli in the jurisdiction of the town of Matamoros, * *."

The judge in certifying to the juridical possession of this land stated:

"I proceeded to place in possession of the eleven (11) sitios for large cattle and six (6) caballerias, of which the Island of Corpus Christi is composed; being comprehended within it, the Island of this name."

There is no evidence in the record to show a grant of this land from the Spanish Government. It is undisputed that if the Ballis made application, as authorized by the judge's decree, to the Governor of Tamaulipas for the issuance of the "legal certificate of title" or "final concession" or "grant" from the Mexican Government, and if the Governor acted on said application and issued such certificate or grant, such certificate or grant was not introduced in evidence on the trial of this case. This record does not show what action, if any, the Governor took on the application for the "final certificate" or "grant" based upon the Treasurer's receipt reciting the payment of $446.00 in payment of eleven sitios and six caballerias of land, denounced by the Ballis.

The land surveyed in 1828 was variously recited to be situated on the "Island of Corpus Christi," the "Island of Brazos de Santiago," and the "Island of Santiago." The name "Padre Island" did not appear in any of the original proceedings. Its first appearance was in deeds made many years later. In 1850 we find Grisanti and Tobar referring to a certain 11½ leagues of pasture land as being called "Padre Island."

From the reports made at the time of the survey by de la Fuente the length of Padre Island and the acreage embraced therein were undoubtedly about the same as when commissioners Bourland and Miller made their report in 1851. De la Fuente began his survey at the place of "Corpus Christi" and concluded it at the place of "Brazo de Santiago." It reasonably appears that de la Fuente used the Gulf shore line as the base line for his survey and ran his right-angle transverses from such shore line. Many objects are called for in his survey, and they are described on the map attached thereto and made a part of the record. The various calls and distances and how the survey was made are described in much detail. This suit is based upon the survey made by Boyles in 1941. The survey shows that the island is 112 1/4 miles long and contains 135,213 acres. Boyles testified that the purpose of his survey was to cover the entire island, in order to ascertain its area. He further testified that he did not undertake to follow the footsteps of de la Fuente or fix the lines of de la Fuente's survey. He made a map of the island showing his survey and the acreage contained therein, and on said map

it was also shown in comparison the acreage as contained in de la Fuente's survey. Boyles further testified that at the time he made his survey he saw only a few head of stock on the island. It also appears from the record that neither the State nor respondents undertook to locate and establish the lines surveyed by de la Fuente. The amount of land contained in Padre Island as reported by Bourland and Miller is substantially the same as that reported by Boyles. From this record it is not convincingly shown that the lines surveyed by de la Fuente cannot now be located and established.

Respondents contend that the juridical possession covered the entire island. Unquestionably the claim of the Ballis to Padre Island, or to the 11.15 leagues denounced and paid for by them, must primarily rest on their dealings and transactions with the Mexican authorities of Tamaulipas and the authorities at Victoria during the years 1827-1829. De la Fuente's survey described 11.15 leagues, and they paid for only 11.15 leagues of land. It is quite plain that when we consider the character of the land at the time the claim was filed and the application made therefor, and the reports made thereon, the only land the Ballis were interested in or desired to pay for was the land suitable for pasturage. They were not interested in the sand dunes and salty bays, as they were unfit at that time for any purpose and were of no value; and it is quite obvious from his report that de la Fuente did not include them in his survey. There is no evidence in this record tending to show that the Mexican authorities intended to grant the entire Padre Island to the Ballis, because the survey showed only 11.15 leagues and the payment received was for only that amount of land. The survey and the Treasurer's receipt describe it as 11.15 leagues, and the judge in certifying to the juridical possession of this land stated that he placed the purchasers in possession of the "eleven sitios for large cattle and six caballerias." It is not shown that the Mexican Government ever issued a final grant to this land, and it is undisputed that the State never issued a patent therefor. The facts conclusively show the amount of land surveyed and paid for, and that neither the Mexican Government nor the State ever granted title to the entire island. When the State confirmed the title to 11½ leagues it discharged its full duty under the Treaty of Guadalupe-Hidalgo. There is nothing in this record to show that the judge intended to give possession of the land not embraced within de la Fuente's survey. If he had done so, his act would not have been valid or binding. Pinkerton v. Ledoux, 129 U. S. 346, 9 Sup. Ct. 399, 32 L. Ed. 706; Ely's Admr. v. The United States, 171 U. S. 220, 18 Sup. Ct. 840, 43 L. Ed. 142;

Camou v. The United States, 171 U. S. 277, 18 Sup. Ct. 855, 43 L. Ed. 163.

The calls contained in the de la Fuente survey control the intention of the government making the grant and the grantee in accepting it. That survey called for a definite amount of land, and the presumption is that the government did not intend to grant more. Welder v. State, 196 S. W. 868 (writ refused) ; 7 Tex. Jur., p. 123, sec. 5. And if the boundary lines of such survey made by de la Fuente can be located and fixed, the holders of the Balli claim are entitled to the land described in such survey. 7 Tex. Jur., p. 125, sec. 6 pp. 140-146, secs. 22, 23. It follows that whatever right to the land on Padre Island not granted to the Ballis remained in the State of Tamaulipas, passed to the State of Texas, and is now owned by the State, unless such right to this land was especially relinquished to the holders of the Balli claim by the Act of 1852.

The State contends that respondents are not entitled to claim and recover any part of Padre Island. This contention rests upon Section 8 of Article 14 of the Constitution of 1876 and Section 2 of the Confirmation Act of 1852, in which the State relinquished to the claimants of the Balli title 11½ leagues called "Padre Island, Cameron County," provided that such land should be surveyed and a return of the field notes thereof made to the General Land Office, and that the Commissioner was authorized and required to have the same platted on the maps of his office and issue patents thereof. It is undisputed that the claimants of this land did not comply with either the Act of 1852 or with Section 8 of Article 14 of the Constitution of 1876.

The State's further contention is that the claimants of this land are forever barred from asserting a claim to the land because they failed to comply with the provisions of the Constitution. Respondents, on the other hand, assert that their title to the entire island was covered by the grant or proceedings which emanated from the Spanish and Mexican governments, as well as by the Act of Confirmation of 1852, and that it was unnecessary for the claimants of the land at that time to comply with the provisions of the Constitution. It is quite plain that the Legislature by the Act of 1852 intended to confirm the application of Grisanti and Tobar for 11½ leagues of land, based upon the survey made by de la Fuente. The map and field notes filed by him are definite and describe in detail the 11.15 leagues of land. The courts of this State have held that grants of land which emanated from the Government of Spain or that of

Mexico, and which had been previously surveyed with definitely described boundaries, and which grants had been recognized and validated by the State, need not be resurveyed. De la Fuente's field notes and map describe the boundaries of the 11.15 leagues surveyed by him. In my opinion they are sufficiently definite to enable a surveyor to locate and fix the lines surveyed by de la Fuente, and carry out the intention of the Legislature to confirm 11 ½ leagues of land based on such survey. See Corrigan v. State, 42 Texas Civ. App. 171, 94 S. W. 95; State v. Corrigan, Texas Sup., 94 S. W. 101; Sullivan v. State, 41 Texas Civ. App. 89, 95 S. W. 645; Sullivan v. Texas, 207 U. S. 416, 28 Sup. Ct. 215, 52 L. Ed. 274; Clark v. Hills, 67 Texas 141, 2 S. W. 356. I agree with the majority opinion in overruling this contention of the State.

It is also contended that Padre Island could not have sold by the State of Tamaulipas to the Ballis because such sale would have violated the settled Mexican law, which expressly provided that the Mexican Government could not sell its land within ten leagues of the coast without approbation of the Supreme Executive Power of the National Government. See General Laws of Colonization of Mexico, No. 72, dated August 18, 1824 (1 Gammel's Laws, 97); Mexican Colonization Law of 1824, Article 4 (1 Gammel's Laws, 39.) And this is furthermore strengthened by the fact that not more than six leagues of grazing land were sold to any one person, as provided for by the laws of Mexico. See General Laws of Colonization of Mexico, No. 72, dated August 18, 1824 (1 Gammel's Laws, 98.)

The Court of Civil Appeals held that respondents' title to the entire Padre Island was protected under the Treaty of Guadalupe-Hidalgo. That court reviewed the laws and decisions relating to this question, and in support of its conclusion said:

"In Cavazos v. Trevino (1871-72), 35 Tex. 133, it was held that the approbation of the federal executive was unnecessary to the validity of a grant of land within the littoral leagues made by the Governor of Tamaulipas to a Mexican citizen." 173 S. W. (2d) 522, 532.)

The foregoing case is the only one cited by the Court of Civil Appeals to sustain its decision, and that case was rendered by the "Reconstruction Court," and it has never been cited with approval by this Court. See Taylor v. Murphy, 50 Texas 291; 1 Tex. Jur., xxxii. The provisions of the Tamaulipas laws regarding grants of land have been construed by this Court in the following cases: State v. Sais, 60 Texas 87, and State v. DeLeon,

64 Texas 553. These cases do not support the holding in the case of Cavazos v. Trevino, supra; cf. Wilcox v. Chambers, 26 Texas 181. The burden rested on the Ballis to prove that the federal executive of Mexico approved their grant, Edwards v. Davis, 3 Texas 321; The Republic of Texas, v. Thorn, 3 Texas 499; Goode v. McQueen's Heirs, 3 Texas 241. The Ballis did not do this. The case of Smith v. Power, 23 Texas 30, involved the title to a grant of four leagues that had been made by the State of Coahuila and Texas. In that opinion the Court said:

"No question is more authoritatively settled by the repeated decisions of this court, than that the consent of the federal executive of Mexico was essential to the validity of a grant of lands, of the character of the present, within the border and coast leagues."

The Court of Civil Appeals further held that if the title to this entire island was not protected under the Treaty of Guadalupe-Hidalgo, the Act of 1852 "cured all defects in the attempted grant of the island by the Tamaulipas authorities, declared the title to be in all things valid, and relinquished all claims of the State thereto." This conclusion of the Court of Civil Appeals rests on the assumption that the Mexican Government, based on the survey of de la Fuente, granted the entire Padre Island to the Ballis, and that the Act of 1852 relinquished the entire island to the claimants of the Balli claim.

The majority opinion, as I understand it, holds that the respondents are entitled to all of Padre Island, based upon the proceedings emanating from the Mexican Government and de la Fuente's survey, independent of the Act of 1852; and the case of Cavazos v. Trevino, supra, is cited in support of that holding. The conclusions of the majority must find support in the assumption that the proceedings had with the Mexican Government were sufficient to pass title to Padre Island and that de la Fuente's survey covered the entire island, and that when the Ballis bought and paid for only 11.15 leagues they acquired all of the island. I submit that de la Fuente did not undertake to survey the entire island, but undertook to survey only the pasture land, and that the Ballis acquired a claim from the Mexican Government for 11.15 leagues and paid for only 11.15 leagues. As further evidence, Grisanti and Tobar applied for a confirmation of 11 ½ leagues of pasture land, and the Act of 1852 confirmed 11 ½ leagues.

The law of November 17, 1833, limited Tamaulipas grants to "six leagues to persons breeding stock." State v. DeLeon, 64

Texas 552. This was the maximum amount of land which 'the Mexican federal law allowed to be united in one individual, as his own property. 1 Gammel's Laws, 98. Article 25 of the Colonization Laws of Tamaulipas of 1826 authorized an adjudication of land to each individual of 120 million square varas,' or an equivalent of five leagues. Article 31 provided that "more than two grants cannot be adjudicated to one individual, and this should the increased number of those he removes demand it of necessity. For any violation in these cases the state shall recover the ownership thereof." 1 Gammel's Laws, 458. The point is that only one adjudication was made to the two Ballis, as individuals. There is no evidence that a second grant was ever applied for on made to them or either of them. If we concede for argument's sake that two grants were made to each of the Ballis under either of the foregoing laws, those grants would not have covered all the land on Padre Island.

In 1830 Santiago Morales sued Juan Jose Balli in the Mexican courts for the purchase money paid by him to Balli for part of Padre Island, which Morales had bought from Balli. He based his right of recovery on the ground "that the denouncement of the Island of Corpus Christi will be invalid, because the claim has not taken the course required by law." On the strength of that statement Morales recovered his purchase money from Balli, thus showing that Balli held an uncertain title from the Mexican Government.

Since the foregoing contention that Padre Island could not have been sold by the State of Tamaulipas to the Ballis because such sale would have violated the settled Mexican law is closely related to the further contention made by the State that if the State is not entitled to recover title to the entire island it is entitled to recover all of the land in excess of the 11½ leagues relinquished by the Act of 1852, the two contentions will be considered together. These contentions turn on the construction of the Act of 1852.

The State issued no patent to this land, and there is no evidence of a final grant having been issued by the Mexican government, and unless respondents are entitled to the land by virtue of their title papers obtained from the Mexican authorities, they must rest their claim thereto from the State by virtue of the Act of 1852.

The Court of Civil Appeals, after discussing the gross discrepancy of the acreage as shown in de la Fuente's survey and the estimate of Bourland and Miller, said:

"The probability is that there was an excess and that there also were accretions. The writer is rather inclined to credit the Bourland and Miller estimate, especially in view of the fact that the de la Fuenta survey was apparently made for the purpose of estimating the amount of pasture land in the island, for which the State of Tamaulipas should be paid, rather than for the purpose of outlining the boundaries of the island which was entirely surrounded by water. De la Fuenta did not attempt to survey the Lagfuna Madre shore line. He completed his survey in eight days."

This was the condition of this title when Texas won her independence from Mexico in 1836. After Texas gained her independence a great deal of confusion arose as to the ownership of lands in Texas lying between the Nueces River and the Rio Grande, within which area Padre Island is located. There was grave doubt as to the legality of the grant under consideration, as well as other grants from the Mexican Government. The State of Texas undertook to carry out its obligations under the Treaty of Guadalupe-Hidalgo, which was ratified in 1848, and the Legislature in 1850 enacted a law authorizing the Governor to appoint two commissioners to investigate and report upon claimed Mexican titles to land between the Nueces River and the Rio Grande, and to pass upon same as to whether or not each should be confirmed. 3 Gammel's Laws, 582.

William H. Bourland and James R. Miller were duly appointed as such commissioners, and I quote the following from their written report and the recommendations made by them relating to Padre Island:

"No. 37. *Nicolas Grisanti and Jose Maria Tobar apply for a 11 1/2 leagues of pasture land called 'Padre Island' originally granted by the Spanish Government to one Nicolas Balli, and subsequently confirmed to him and his nephew Juan Jose Balli by the Mexican Authorities. * * * We recommend for confirmation 11 1/2 leagues only, to the heirs or assigns of original grantee, for we feel confident that the island called 'Padre Island' contained or embraced over 30 leagues of land. It is therefore to be understood that we recommend only 11 1/2 leagues of said land. For testimony in this case see File No. 37, Cameron County.*" (Emphasis mine.)

Acting upon this recommendation, the Legislature of Texas passed the Act of February 10, 1852. The pertinent parts thereof read as follows:

"Be it enacted by the Legislature of the State of Texas, That the State of Texas hereby relinquishes all her right and interest in the following described lands to the original grantee thereof, their heirs and legal assigns towit:

"Cameron County

(12) Nicolas and Juan Jose Balli, eleven and a half leagues called 'Padre Island.'"

Section (5) provides:

"Provided that nothing in this act shall be so construed as to relinquish the rights of the State to any of the islands or salt lakes situated in the territory embraced in this act."

The Act of February 10, 1852 (3 Gammel's Laws, 941, 946) lists the Balli land under the head of "Cameron County." Prior to that time, in 1851, the Legislature had defined the boundaries of Cameron County. It is undisputed that Padre Island is about 110 miles in length, and that it lies within the present counties of Nueces, Kleberg, Kenedy, Willacy, and Cameron. It is also undisputed that Cameron County to that time did not embrace the whole of Padre Island.

The rule of strict construction in favor of the State regarding grants relating to islands is applicable to Mexican grants as well as to grants made by the State and the Republic of Texas. State v. Delesdenier, 7 Texas 76; Galveston v. Menard, 23 Texas 349; 34 Tex. Jur., p. 221, sec. 155. This Court has repeatedly announced the well-established rule that legislative grants of land must be strictly construed in favor of the State, and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity in the terms of a statute must operate in favor of the State. Grayburg Oil Co. v. Giles, 143 Texas 497, 186 S. W. (2d) 680; Magnolia Petroleum Co. v. Walker, 125 Texas 430, 83 S. W. (2d) 929; Empire Gas & Fuel Co. v. State of Texas, 121 Texas 138, 47 S. W. (2d) 265; Dolon v. Walker, 121 Texas 361, 49 S. W. (2d) 695; State v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065; Lewis' Sutherland on Statutory Construction, Vol. 2, sec. 548; Coosaw Mining Co. v. State of South Carolina, 144 U. S. 550, 12 S. Ct. 689; 36 L. Ed. 537; Central Transportation Co. v. Pullman's Palace-Car Co., 139 U. S. 24, 11 Sup. Ct. 478, 35 L. Ed. 55; Shively v. Bowlby, 152 U. S. 1, 14 S. Ct. 548, 38 L. Ed. 331; 39 C. J., pp. 1122, 1123, sec. 664; 18 R. C. L., p. 1220.

The wisdom of the foregoing rule is clearly manifest, and the rule is particularly applicable to this case.

In 1851 this Court in the case of State v. Delesdenier, supra, in discussing the public policy of the Republic of Texas with reference to the reservation of islands, said:

"By the act of January 20, 1840 (Hart. Dig., art. 127), adopting the common law and repealing all former laws, of the former Government reserving islands, etc., were especially continued in force.

"And, although no such laws are known to exist, the exception indicates the belief of the Congress that islands at that time were not subject to location, and its intention to continue such laws in force."

In 1851 Bourland and Miller reported to the Legislature that the island contained a little more than 30 leagues. In 1941 Boyles surveyed the island and reported that it contained about 30½ leagues. It is quite obvious that de la Fuente did not undertake to survey the entire island. The Commissioners had before them the record of de la Fuente's survey and the applications of Grisanti and Tobar for confirmation of the 11½ leagues of pasture land, *and they made their recommendations to the Legislature for confirmation of 11½ leagues only.* The Legislature accepted such recommendation and adopted the Act of 1852. The State in that Act recognized the claim for 11½ leagues and confirmed same, and those who claim under the Ballis are entitled to the 11½ leagues.

The State in several instances has filed suits and recovered excess land. See Sullivan v. State, 41 Texas Civ. App. 89, 95 S. W. 645, 207 U. S. 416, 28 Sup. Ct. 215, 52 L. Ed. 274; Heard v. Town of Refugio, 129 Texas 349, 103 S. W. (2d) 728; Findlay v. State, 238 S. W. 956, aff. 130 Texas 30, 250 S. W. 651; State v. Post, 169 S. W. 401, Id. 106 Texas 468, 169 S. W. 407. In Sullivan v. State, 41 Texas Civ. App., 89, 95 S. W. 645, 207 U. S. 416, 28 Sup. Ct. 215, 52 L. Ed. 274, the State brought suit for all land in excess of the 6½ leagues confirmed by the State in the Act of 1852 for the full amount of 6½ leagues and no more. Defendants claimed that the land involved emanated from a Mexican grant of 6½ leagues to Pedro de la Garza, made in 1832, which was confirmed by the Act of 1852. In that suit the State recovered the excess. In construing the Act of 1852 the Court said:

"The survey provided for in the act of confirmation was to be made of the land originally granted by the Mexican authorities, and could not legally include any other land. Clark v. Hills,

67 Tex. 145-146, 2 S. W. 356. And if the survey caused to be made by the owners of the grant in this case under the act of confirmation included other or more land than the original grant and survey made by virtue thereof, it would be void as to such other land or excess."

The Supreme Court of the United States in affirming the judgment of the Texas Court in Sullivan v. State, 207 U. S. 416, 28 Sup. Ct. 215, 218, 52 L. Ed. 274, said:

"It could not have been within the contemplation of the Legislature that this surveyor, picked out by the claimant, should have power to bind the State, by the mere matter of survey, to a grant nearly double the size of that which is confirmed by the statute of relinquishment."

The recent case of Heard v. Town of Refugio, 129 Texas 349, 103 S. W. (2d) 728, involved an excess of 43.9 acres of land within the bounds of the four leagues granted by Coahuila and Texas to the Town of Refugio. The excess was sued for, and this Court held that it could be recovered. Judge Smedley in the course of the opinion said:

"While the title acquired by the Town of Refugio under the colonization law may have been merely an incipient of equitable title, as is suggested in Town of Refugio v. Byrnes, or may have been subject to the control and disposition of the sovereign (Dittmar v. Dignowity, 78 Texas 22, 14 S. W. 268;; Pence v. Cobb, 155 S. W. 608, 610), *the nature of the original title is made unimportant by the act of confirmation.* That act, by authorizing and requiring the Commissioner of the Land Office to issue to the mayor and aldermen of the town and their successors a patent for the *four leagues of land,* had the effect of vesting in the town as a corporation the legal title and absolute ownership of all of the land (*and no more*) that was dedicated, reserved or granted to the town by the Colonization Law. Town of Refugio v. Straunch (Com. App.), 29 S. W. (2d) 1041." (Emphasis mine.)

Respondents contend that the State never asserted any claim or exercised any control over any part of Padre Island after confirming the Balli claim by the Act of 1852. They also contend that the official maps show this land is not claimed by the State. Let us keep in mind the history of the times and the nature of this land when the Act of 1852 was passed. It is well known that this land is only a few feet above sea level, and that practically all, if not all, of the land comprising Padre Island is frequently

flooded during storms. Much of this land, as shown by the reports, consists of sand dunes. No substantial improvements of any nature have ever been located on the island. The sand dunes and salty bays had no material value until recent years, when oil and gas were discovered in that part of Texas. They are now very valuable on account of the mineral prospects. The record shows that only the land with grass on it was desirable. The Ballis did not want to buy the undesirable land, and they paid for only 11.15 leagues. If the State did not part with the title to the land in excess of 11½ leagues by the Act of 1852, such excess still belongs to the State. And the State would not be deprived of its right to claim such excess land merely because some officer failed to assert title to same for the State; nor would it lost its right by reason of the lapse of time, or on account of adverse possession or the payment of taxes, or because on some map it was not shown that the land was claimed by the State, or because some officer had been derelict in protecting the rights of the State. Sullivan v. State, 41 Tex. Civ. App. 89, 95 S. W. 645; Id., 207 U. S. 416, 28 Sup. Ct. 215, 52 L. Ed. 274; Weatherly v. Jackson, 123 Texas 213, 71 S. W. (2d) 259; Humble Oil & Refining Co. v. State, Tex. Civ. App., 162 S. W. (2d) 119, writ refused.

Respondents further contend that the State has no right under this record to assert any claim to the land in excess of the 11½ leagues relinquished by the State. Let us test this contention in connection with the undisputed and controlling facts as reflected by this record. The following are undisputed facts: (1) That the application for the grant from the Mexican Government by the attorney in fact for Nicolas Balli and Juan Jose Balli described the land as containing 19½ leagues; (2) that the Ballis, based upon de la Fuente's survey and report, paid for only 11.15 leagues of pasture land; (3) that the certificate of juridical possession described the land as 11.15 leagues; (4) that Grisanti and Tobar, who acquired the Balli claim to the land acquired from the Mexican Government, applied to the commissioners appointed to investigate such claims for confirmation of "11½ leagues of pasture land"; (5) that Bourland and Miller *recommended a confirmation of 11 1/2 leagues only,* and in the same document stated they were confident that the island contained or embraced over 30 leagues of land; and (6) that the Legislature adopted the recommendation of the commissioners by enacting the Act of 1852, and relinquished the right of the State in 11½ leagues of land, called "Padre Island, Cameron County," but in keeping with the public policy of the State reserved the rights of the State to any of the islands or salt lakes situated in the territory covered by said Act.

That 11½ leagues was the amount of land covered by the grant is the dominant fact running through this case. The survey covered 11.15 leagues, payment was made for 11.15 leagues, and the juridical certificate of possession was for the pasture land consisting of 11.15 leagues. The claimants under Balli asked the State for 11½ leagues of pasture land, and the State by the Act of 1852 granted them 11½ leagues. Can it be said that the holders of the grant and the Legislature of Texas were doing a vain and useless thing and were acting without reason and without authority when the Act of 1852 was passed? Until such Act was passed the holders of the grant held, at best, only a questionable claim. Under the undisputed facts it can not be seriously contended that the Legislature intended by the Act of 1852 to confirm a grant of the entire Padre Island, which contains more than 30 leagues of land, when the Act specifically confirmed 11½ leagues. When the language used in the Act is tested by any recognized rule governing the construction of statutes, considered in connection with the long-established public policy of the State relating to islands and submerged lands, it is clearly evident that the Legislature did not intend to relinquish and confirm unto Grisanti and Tobar more than 11½ leagues of land, as described in the de la Fuente survey, and the State is entitled to recover the excess over 11½ leagues.

The next point to be considered involves the doctrine of accretions to islands owned by the State. Much has been written on the subject of accretions, but it would serve no useful purpose to discuss the various principles and rules applicable to accretions in different States and in different countries. Whatever authorities and decisions are cited and discussed here will be for the sole purpose of ascertaining whether the State relinquished its right to the accretions to Padre Island by the Act of 1852.

In the case of Miller v. Letzerich, 121 Texas 248, 49 S. W. (2d) 404, 85 A. L. R. 451, this Court, speaking through Chief Justice Cureton, said:

"The statutes in force in the Republic of Texas before the introduction of the common law are to be construed in the light of the Mexican civil law, and the validity and legal effect of contracts and of grants of land made before the adoption of the common law must be determined according to the civil law in effect at the time of the grants."

Texas has always zealously guarded her rights in the seashore and in her islands and submerged lands, and has never

passed any law relinquishing her rights in such lands. This Court has repeatedly held that an ordinary grant of land along the seacost does not pass title to any land that is covered by the water, and the grantee "takes only to the shore, which, at common law, is the line of ordinary high tide, but which, under the civil law, is the line of the highest tide in winter." 44 Tex. Jur., p. 127, sec. 99. Furthermore, Texas retains its control and ownership of the islands and the waters of the bays and Gulf for three leagues from the shore. Act of 1840, Hartley's Digest, Art. 127; State v. Delesdenier, 7 Texas 76; City of Galveston v. Menard, 23 Texas 349; State of Jadwin, Tex. Civ. App., 85 S. W. 490, writ refused; DeMerritt v. Robison, 102 Texas, 358, 116 S. W. 796.

The rule of strict construction would be applicable to the granting of land on an island even though Section 5 had not been included in the Act of 1852. The case of City of Galveston v. Menard, supra, involved the construction of an Act of the Texan Congress passed on December 10, 1836, authorizing the relinsuishment of part of Galveston Island to Menard. The question of the ownership of the bays, flats, etc. under the grant arose in that case for decision. This Court in 1859, in an exhaustive opinion written by Mr. Justice Roberts, reviewed the authorities concerning the power to make such a grant, and the authorities which showed who acquired the sea, bays and rivers, and their shores, under such a grant, and in the course of the opinion it was said:

"This power results, as a necessary consequence of the absolute sovereignty of the republic, over the territory included in its limits. The southern boundary of that territory was defined by an act of the Texan congress, to extend from 'the mouth of the Sabine river, and running west along the gulf of Mexico, three leagues from land, to the mouth of the Rio Grande,' etc. After annexation of Texas, the state, by an act of the legislature, re-affirmed its 'exclusive right to the jurisdiction over the soil, included in the limits of the late republic of Texas,' excepting such as may be vested in the United States, by the constitution of the United States, and by the joint resolution of annexation. Hart, Dig. arts. 1631 and 1634. * *.

"In the civil law, it is said, that the sea, bays and rivers, with their shores, were common; free to the use of any one, and are deemed to belong to no one.

*    *    *    *    *    *    *

"The main question is, does this act confer the right to the

shore and flats, lying south of the channel of the bay? If viewed as an ordinary grant of land, it does not. The coast, and to the extent of ten littoral leagues in the interior, had been reserved from colonization, since 1824, except by the consent of the general government of Mexico. It had not been the policy of that government to encourage its settlement, or the settlement of the islands, by which it is lined.

"On the next day after the passage of this act, another was passed, by which it was resolved, 'that all islands belonging to this republic, shall be, and are hereby, reserved for the government use, except the president be authorized, specially, to sell them.' 1 Cong. 76. Which authority was given in June, 1837. 1 Cong. 267, 268. By this it was manifested, that a special control over the islands was assumed by the government. By the civil law, the shores of the sea, of bays, and navigable streams generally, as well as the tide-waters, were jealously guarded from private appropriation, and reserved for common use."

For a discussion of the doctrine that accretions are not allowed to land fronting on the sea, see the following authorities: Corpus Juris, Vol. 40, p. 1437, sec. 239; Code of Napoleon, Book II, Section 1, Articles 556, 557, 558; Institutes of Justinian, Revised Edition, 1852, by Thomas Cooper, Book II, Title 1, Law 1, p. 87; Third Book of the Partidas, Title 28, Law 3; Kent's Commentaries, 13th Edition, Vol. 3, p. 427; Tex. Jur., Vol. 44, p. 127, sec. 100.

We have not been pointed to any definite statement as to what the civil law of Tamaulipas was in 1827-1830, but we do find that on June 29, 1871, Tamaulipas adopted a civil code, which among other things contained the following:

"Art. 894.—The owners of estates bounded by lakes or ponds do not acquire the land uncovered by the natural diminution of the waters, nor lose that which is inundated by extraordinary flows."

"Art. 898—The islands which are formed in the seas adjacent to the coast of the state are public domain, and no one can acquire property in them except by concession from the government."

It must be conceded that the law controlling in this case is the civil law in force in the State of Tamaulipas from 1827 to 1830, during which period the Ballis acquired their claim from that government. It can be assumed that the law then in force

in the State of Tamaulipas was the civil law applicable in Spain. Respondents in their brief admit that "the ancient Spanish law, found mainly in Las Siete Partidas, continued to be the municipal law within the present area of Texas until the Congress of the Republic adopted the Common Law." The common law was adopted in 1840, and this Court approved the rule "that the common law as modified by our local conditions is in force in Texas." Welder v. State, Tex. Civ. App., 196 S. W. 868, 870, writ refused. See also Grigsby v. Reib, 105 Texas 597, 153 S. W. 1124, L. R. A. 1915E, 1 Ann. Cas. 1915C, 1011; Clarendon Lands, Investment & Agency Co. v. McClelland, 86 Texas 185, 23 S. W. 576, 22 L. R. A. 105; Id., 86 Texas 179, 23 S. W. 1100, 22 L. R. A. 105; Texas Jurisprudence, Vol. 9, p. 307, sec. 9.

In the case of Manry v. Robison et al, 122 Texas 213, 56 S. W. (2d) 438, 446, Chief Justice Cureton, writing the opinion of this Court, exhaustively reviewed the authorities relating to the rights of riparian owners arising under the civil, common, and Roman law. He pointed out that those nations in adopting the Roman law adopted a construction which was most suitable to their conditions. We quote briefly from that opinion as follows:

"England in adopting the Roman law as to its *nontidal* streams adopted the construction insisted on by Selden, Vinnius, Mr. Farnham (Vol. 1, Sec. 49), and others, that the title of the riparians extended to the center of the streams, because that construction was siutable to her conditions; while Franch, Spain, and Mexico adopted that interpretation indicated by Gaius (Scott's Civil Law, Vol. 9, p. 107), and followed generally by the American courts (Farnham, Vol. 1, Sec. 49), that title to the beds of all navibale streams, so long as occupied, was in the public or the sovereign, because that construction was suitable to their conditions.

"Each of the nations named in selecting its interpretation of the Roman law as to the ownership of stream beds, so long as occupied, chose that rule which was best suited to its conditions."

Florida was also a province of Spain, and operated under the Spanish civil law until it was ceded to the United States in 1819. The case of Apalachicola Land & Development Co. v. McRae, 86 Fla. 393, 98 So. 505, involved title to a grant from the Lower Creek and Seminole Indians to John Forbes & Co., which grant was alleged as having been confirmed by the Spanish authorities in 1811 and leave given to transfer such grant to Colin Mitchel. The Supreme Court of Florida, in an exhaustive opinion, reviewed the authorities relating to the Spanish law, and

held that under the civil law in force in Spain and its provinces, when not modified by ordinances affecting the provinces, the sales and grants of submerged and tide lands to invididuals were contrary to the general laws and customs of the realm. In support of its decision many cases were cited, including City of Galveston v. Menard, supra.

The Supreme Court of Louisiana, a civil law State, in the case of Zeller v. Southern Yacht Club, 34 La. Ann. 837, held that the accretions to the shore of Lake Ponchartrain, a tidal lake, were the property of the State and not the property of abutting owners.

The case of Ker & Company v. Couden, 223 U. S. 268, 32 Sup. Ct. 284, 56 L. Ed. 432, involved accretions to land in Cavite, Loŭzon Island, Phillippines, where the civil law admittedly was in force. The case went through the courts of the Philippines and finally reached the Supreme Court of the United States. Plaintiff in error in that case contended: "The Supreme Court of the Philippines erred in holding that the law, as written in the Partidas, declares that land above seashore formed by accretion from the sea belongs to the Crown and not to the riparian owner. Laws, 3, 4, 6, 34, Tit. 28 ed Partidas." Defendant in error contended: "The land in controversy, having been formed from time to time since the year 1811, down to the present, by accession or accretion, occasioned by the action of the sea, became, as it was formed, a part of the public domain of Spain, and, as such, became, upon the acquisition by it of the Philippine Islands, a part of the public domain of the United States." Mr. Justice Holmes wrote the opinion for the Supreme Court of the United States. He stated that he was dealing with the law of the Philippines, just as we are dealing here with the law of Tamaulipas and Texas. It is well to keep in mind that Texas, Tamaulipas, and the Philippines were for a long period of time provinces of Spain. Mexico, of which Tamaulipas was a State, won her independence in 1821, and Texas won her independence from Mexico in 1836. The Supreme Court of the United States held in effect that under the civil law, while accretions occurred from 1811 to the date of the trial, such accretions belonged to the United States as the sovereign which succeeded to the rights of Spain in the Philippines. Mr. Justice Holmes was well qualified by scholarship, training, and experience to review the authorities bearing on the question of accretions, and we quote freely from the opinion written by him in that case as follows:

"The plaintiffs claim title under conveyances from the owner

of the upland. The Philippine courts held that under the Partidas, III, Tit. 28, Laws 3, 4, 6, 24 and 26, and the Law of Waters of 1866, the title to the accretions remained in the Government, and the vexed question has been brought to this court.

"That the question is a vexed one is shown not only by the different views of Spanish commentators but by the contrary provisions of modern codes and by the occasional intimations of the doctors of the Roman law. Justinian's Institutes, 2, 1, 20 (Gaius II. 70), followed by the Partidas, 3, 28, 26, give the alluvial increase of river banks to the owner of the bank. If this is to be taken as an example illustrating a general principle there is an end of the matter. But the Roman law is not like a deed or a modern code prepared *uno flatu*. History plays too large a part to make it safe to generalize from a single passage in so easy a fashion. Alongside of the rule as to rivers we find that the right of alluvion is not recognized for lakes and ponds, D. 41, 1, 12, a rule often repeated in the civil law codes, e. g., Philippine Civil Code of 1889, Arts. 366, 367. Code Napoleon, Art. 550. Italy, Civil Code, 1865, Art. 454. Mexico, Art. 797. If we are to generalize, the analogy of lakes to the sea is closer than that of rivers.—We find further that *In agris limitatis jus alluvions locum non habet*. And the right of alluvion is denied for the *agrum manu captum,* which was *limitatum* in order that it that it might be known (exactly) what was granted. D. 41, 1, 16. The gloss of Accursius treats this as the reason for denying the *jus alluvionis*. If this reason again were generalized, it might lead to a contrary result from the passage in the Institutes. Grotius treats the whole matter as arbitrary, to be governed by local rules, and both the doctrine as to rivers and the distinction as to accurately bounded lands as rational enough. De Jure B. & P. Lib. 2, cap. 8, 11, 12. A respectable modern writer thinks that it was a mistake to preserve the passage concerning definitely bounded grants in the Digest, 1 Demangeat, Droit Romain, 2d ed. 441 ('antiquirt' Puchta, Pandekten, sec. 165), but so far as we have observed this is an exceptional view, and from the older commentators that we have examined down to the late brilliant and admirable work of Girard, Droit Romain, 4th ed. 324, this passage seems to be accepted as a part of the law. At all events it shows that, as we have said, it is unsafe to go much beyond what we find in the books. And to illustrate a little further the uncertainty as to the Roman doctrine we may add that Donellus mentions the opinion that alluvion from the sea goes to the private owner only to remark that the texts cited do not support it, De Jur. Civ. IV, c. 27, 1 Opera (ed. 1828), 839 n., and treats the rule of the Institutes as peculiar to rivers, as also Vinnius in his comment on the passage stating the rule seems

to do, while Huberus, on the other hand, thinks that rivers furnish the principle that ought to prevail. Praelectiones, II, Tit. 1, 34.

"The seashore flowed by the tides, unlike the banks of rivers, was public property; in Spain belonging to the sovereign power. Inst. II, Tit. 1. 3, 4, 5. D. 43, 8, 3. Partidas, III, Tit. 28, 3, 4. And it is a somewhat different proposition from that laid down as to rivers if it should be held that a vested title is withdrawn by accessions to what was owned before. Perhaps a stronger argument could be based on the rule that the title to the river bed changes as the river changes its place. Part. III, Tit. 28. Law 31. Inst. 2. 2, 23. D. 41. 1. 7, 5. But we are less concerned with the theory than with precedent in a matter like this, whether we agree with Grotius or not in his general view. The Spanish commentators do not help up, as they go little beyond a naked statement one way or the other. It seems to us that the best evidence of the view prevailing in Spain is to be found in the codification which presumably embodies it. The Law of Waters of 1866, which became effective in the Philippines in September, 1871, and the validity of which we see no reason to doubt, after declaring like the Partidas that the shores (playas), or spaces alternately covered and uncovered by the sea, are part of the national domain and for public use, Arts. 1, 3, goes on thus: 'Art. 4. The lands added to the shores by the accessions and accretions caused by the sea belong to the public domain. When they are not (longer) washed by the waters of the sea, and are not necessary for objects of public utility, nor for the establishment of special industries, nor for the coast guard service, the Government shall (will?) declare them property of the adjacent estates, in increase of the same.'

"Notwithstanding the argument that this article is only a futile declaration concerning accessions to the shore while it remains such in a literal sense, that is, washed by the tide, we think it plain that it includes and principally means additions that turn the shore to dry land. These all remain subject to public ownership unless and until the Government shall decide that they are not needed for the purposes mentioned and shall declare them to belong to the adjacent estates. The later provisions in Article 9, that the public easement for salvage, &c., shall advance and recede as the sea recedes or advances, simply determines that neither public nor private ownership shall exclude the customary public use from the new place. The Spanish Law of Ports of 1880, like the Law of Waters, asserts the title of the State although it confers private rights when there is no public need.

"The presumption that the foregoing provisions of the Law of Waters express the understanding of the codifiers as to what the earlier law had been, becomes almost inexpugnable when we find that the other leading civil law countries have adopted the same doctrine. The Code Napoleon, after laying down the Roman rule for alluvion in rivers, Art. 556, 557, adds at the end of the latter Article: 'Ce droit n'a pas lieu a l'egard des relais des la mer,' which seems to have been adopted without controversy at the Conference. See further Marcade, Explication, 5th ed., vol. 2, p. 439. And compare 2 Hall's Am. Law Journal, 307, 324 329, 333. The Civil Code of Italy, 1865, Art. 454, is to similar effect. See also, Chile, Civil Code, Art. 650. The Supreme Court of Louisiana in like manner confines the private acquisition of alluvion to rivers and running streams, and denies the private right in the case of lakes and the sea. Zeller v. Yacht Club, 34 La. Ann. 837. And the provision of the Louisiana Code, Art. 510, is like those of France, Italy and Spain. The court of first instances below refers to judgments of the Supreme Court of Spain that seem to look in the same direction. We have neither heard nor found anything on the other side that seems to us to approach the foregoing considerations in weight, not to speak of the respect that we must feel for the concurrent opinion of both the courts below upon a matter of local law with which they are accustomed to deal."

The policy of this State has been to reserve its shallow submerged lands for the public's use, and prohibit any ministerial officer from selling same. In other words, it takes an Act of Legislature to convey such lands. Lorino v. Crawford Packing Co., 142 Texas 51, 175 S. W. (2d) 410; State v. Bradford, 121 Texas 515, 50 S. W. (2d) 1065; City of Galveston v. Mann, 135 Texas 319, 143 S. W. (2d) 1028; Hynes v. Packard, 92 Texas 44, 45 S. W. 562; DeMerrit v. Robinson, 102 Texas 358, 116 S. W. 796; Dincans v. Keeran (Civ. App.), 192 S. W. 603. In DeMerritt v. Robison, supra, this Court quoted with approval from the opinion in Rosborough v. Picton the following:

" 'According to both the common and civil law, an ordinary grant of land along the seacoast, made by the ministerial officer of the government, did not pass the title to land under water or beyond the coast line. This line was fixed by the common law at the point reached by ordinary high tide, and by the civil law at the mark of the highest tide. The exterior boundary line of the grant to Power and Hewitson was the seacost (Sayles' Early Laws, 108; Hamilton v. Menifee, 11 Tex. 718), and no authority was given them over the waters of the sea, or of the bays and inlets, or of the soil under them. These are, by well-

settled principles, reserved for ccmmon use. Hence the grants by the commissioner of that colony passed title only to land which was not under the waters of the sea. Galveston v. Menard, 23 Tex. 349; Galveston Surf B. Co. v. Heidenheimer, 63 Texas 562; Arnold v. Mundy, 6 N. J. Law, 1, 10 Am. Dec. 456; Den v. Sawyer, 9 N. C. 226; Martin v. Waddell, 16 Pet. 369, 10 L. Ed. 997.' That opinion was approved by this court in Hynes v. Packard, 92 Tex. 49, 45 S. W. 563, saying: 'In Rosborough v. Picton, 12 Tex. Civ. App. 113, 34 S. W. 791, the title to the same land was involved, and the Court of Civil Appeals in a very clear opinion by Judge Williams decided that the land was not the subject of grant by the officer who executed the Hynes title, and that no right passed by such grants. We think the decision is correct. Hynes, having no title, conveyed none, and was liable upon his covenant of warranty.' "

No case has been cited, nor has any been found, which involved facts similar to the facts of the case under consideration. This Court has not heretofore been called upon to write on the precise questions in this case. However, it has been called upon to pass upon the question of accretions, presented in cases coming by appeal from the Court of Civil Appeals. In the case of State v. Jadwin, 85 S. W. 490 (writ refused), was presented the question of accretions to lands of Galveston Island. It was there contended that the land did not belong to the State, but went to the owner of the land adjoining said accretions. In that opinion it was said:

"The land upon the island belonged to the state. Equally the waters of the bay and the gulf for three leagues from the shore. As between Texas, as the grantor, and the United States, as grantee, the grant could not be enlarged by accretion. What Texas granted to the federal government was the specific lands devoted to purposes of public defense. It seems obvious that, if these lands should be reduced to the bottom of the sea by storms and tides, the space they occupied would still belong to the government of the United States, to do with as it chose. On the other hand, it seems equally obvious that the waters surrounding this grant remained Texas territory, and the land builded thereon by the action of the sea would be equally hers."

In the case of Dincans v. Keeran, supra, the Court of Civil Appeals at San Antonio held that a bayou affected by the ebb and flow of the tide was common property belonging to the people, and that an adjacent landowner could not maintain an action for trespass against people using such bank or seashore.

The Court of Civil Appeals and the majority opinion cite the

case of State v. Texas Land & Cattle Co., 34 Texas Civ. App. 460, 78 S. W. 957, in support of their holdings. That suit involved the title to a tract of land known as "Los Laureles Ranch," situated on the mainland in Nueces County. The holding in that case is based on the case of Denny v. Cotton, 3 Tex. Civ. App. 634, 22 S. W. 122. The issue of accretion to land fronting on a river was involved in the Denny case, and only cases and authorities bearing on accretion to land fronting on rivers are cited to support the decision. The accretion to land fronting on the sea was not involved, and was not discussed in that opinion. No application for writ of error was presented to this Court in the case of State v. Texas Land & Cattle Co., supra. The case of State v. Jadwin, supra, in which a writ of error was refused by this Court, arose after the case of State v. Texas Land & Cattle Co., supra, was passed upon. This Court approved the opinion of the Court of Civil Appeals in that case by refusing a writ of error.

The Legislature of Texas has the sole authority for the granting of public lands. Since the Republic of Texas was organized, the islands, submerged lands, and the seashore of Texas have been jealously guarded for the benefit of the public, and any grants concerning the same are strictly construed in favor of the State.

This record clearly shows that the Ballis intended to buy and pay for only the pasture land on Padre Island, and those claiming under them are entitled to none of the excess. The fact that the land the Ballis did not buy was worthless and undesirable at the time of the grant, did not deprive the State of its title to such land. To deprive the State of the right to recover the amount of land in excess of 11½ leagues, which excess existed in 1852 and exists now, would be contrary to what the original claimants intended and what the Legislature actually had in mind when passing the Act of 1852. Grisanti and Tobar asked that the State confirm to them 11½ leagues of pasture land which they had acquired from the Ballis, and the Legislature confirmed 11½ leagues of land to them. To now award to the holders of the Balli claim all the land in excess of the 11½ leagues, together with the bays and accreted lands as well, is directly contrary to the unbroken public policy of this State and the Act of 1852. Doing this simply means that approximately 20 leagues of land, and in addition thereto the bays, sand dunes and accretions, considered worthless and undesirable and not worth paying for at the time of the grant, but now very valuable on account of the potential production of minerals, will be lost to the State without the claimants' ever having paid anything therefor.

I think the majority decision in this case is clearly contrary to the weight of authority and the long-established public policy of this State with reference to the seacoast, submerged lands, islands, and accretions formed by the sea to islands, and hence I feel compelled to dissent. The power to change this policy rests exclusively with the Legislature, and does not rest with the courts. I think the State is entitled to the land in excess of the 11½ leagues and to the accredited land formed since the original purchase. This case should be reversed and remanded.

Opinion delivered November 7, 1945.

MR. JUSTICE SIMPSON, dissenting.

I am in agreement with Associate Justice Sharp's views, expressed in his dissent, to the effect that the footsteps of the original surveyor, de la Fuente, can be traced. The title extended by the State of Tamaulipas to the Ballis is no doubt a valid one and should be sustained. But I conclude it was not intended to cede to the Ballis an entire island but only the pasture land on it. This land was surveyed while the title was in the process of being extended; plats showing the results of this survey are in the record; and under established principles, the footsteps of the original surveyor should be followed and the title upheld within the boundaries of his survey. Clark v. Hills, 67 Texas 141, 2 S. W. 356; Corrigan v. State, 42 Texas Civ. App. 171, 94 S. W. 95, affirmed 94 S. W. 101; Sullivan v. State, 41 Texas Civ. App. 89, 95 S. W. 645, affirmed 207 U. S. 416, 28 S. Ct. 215, 52 L. Ed. 274.

I concur with the view of the majority on the law of accretions.

Opinion delivered November 7, 1945.

MR. CHIEF JUSTICE ALEXANDER, dissenting.

I am of the opinion that respondents should be permitted to recover only 11½ leagues of land off the East side of Padre Island, and I therefore concur in the dissent by Mr. Justice Sharp.

At the time this case was originally presented the Attorney General contended that respondents were not entitled to recover any part of Padre Island. No emphasis was placed on the assignment that respondents were entitled to recover only a part of the island. On the motion for rehearing it is now urged that

respondents are entitled to recover only 11½ leagues, and I am of the opinion that this contention should be sustained.

I summarize my views as follows:

At the time Balli and his nephew negotiated for the purchase of the land from the Mexican Government in 1828 the law permitted one person to purchase only six leagues of land. Balli and his nephew could purchase only twelve leagues.

The Mexican Government had the land inspected two or three times in order to ascertain definitely the quality of the land to be conveyed to the purchasers and the price to be charged therefor. De la Fuente made the survey of the land for Balli and his nephew and the Mexican Government in 1828. His field notes included only 11.15 leagues off the East side of the island.

While de la Fuente's field notes definitely call for the east or Gulf side of the island at the east boundary of the land to be granted to Balli and his nephew, there is only one call for the west or Laguna side of the island, and that is at the north end of the island where it is very narrow. The survey was made by beginning at the north end of the island and going south along the east side thereof and measuring—by stretching a cord—from east to west part of the way across the island at intervals of approximately five miles each. The length of these measurements from east to west were given. The amount of the land included in the survey was ascertained by assuming an imaginary line from north to south connecting the extreme west ends of the cords stretched across the island. Many of the measurements from east to west did not extend halfway across the island according to the present dimensions of the island. When Miller and Bourland inspected the island in 1852 they found that it contained more than thirty leagues of land. In fact, at the time Balli and his nephew were negotiating for the purchase of the land in 1828 they admitted that the island contained over nineteen leagues. The survey made by de la Fuente for the land to be set aside to Balli and his nephew contained only 11.15 leagues. It is apparent, therefore, that the survey made by de la Fuente included only a narrow strip of land along the east side of the island. The footsteps of the surveyor can be followed and the land located.

After de la Fuente completed his survey Balli and his nephew paid for only 11.15 leagues.

The successors to Balli and his nephew were unable to find the title papers to the land, but they were able to produce a receipt showing that they had paid the Mexican Government for 11.15 leagues. As a consequence they applied to the Texas Legislature for relief. In 1850 the Legislature of Texas appointed a commission composed of Miller and Bourland to investigate the claim and report back to the Legislature. Miller and Bourland reported in part as follows:

"We recommend for confirmation 11½ leagues *only,* to the heirs or assigns of original grantee, *for we feel confident that the island called 'Padre Island' contained or embraces over 30 leagues of land.* It is therefore to be understood that we recommended *only* 11½ leagues of said land. For testimony in this case see File No. 37, Cameron County." (Emphasis mine.)

It will be noted that in 1852 the commissioners were of the opinion that Padre Island contained over thirty leagues of land. However, they recommended that the applicants be granted *only* 11½ leagues. The Legislature subsequently granted "11½ leagues called Padre Island."

Since under the Mexican law as it existed at the time the parties negotiated for the purchase of the land, Balli and his nephew could purchase only twelve leagues of land; and since their field notes called for only 11.15 leagues and they actually paid for only 11.15 leagues; and since Miller and Bourland recommended to the Legislature of this State the approval of a grant of only 11½ leagues, and the Legislature granted only 11½ leagues or approximately 51,000 acres, I am unwilling to approve a judgment for 30½ leagues, or approximately 135,000 acres, of land.

I am not in accord with the majority opinion granting the whole of the island to the respondents.

I concur with the view of the majority on the law of accretions, but I do not consider a decision on this question decisive of the question involved in this case.

Opinion delivered November 7, 1945.